[Civ. No. 6069.  First Appellate District, Division Two.—May 21, 1928.]

J. H. HUMPHREYS et al., Appellants, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation) et al., Respondents.

Treadwell, Van Fleet & Laughlin for Appellants.

John J. O'Toole, City Attorney, and Dion R. Holm, Assistant City Attorney, for Respondents.

LUCAS, J., *pro tem.*—By this action the ten parties plaintiff (appellants herein), residents and taxpayers of, and property owners in, the City and County of San Francisco, seek, on behalf of themselves and 1,700 other property owners, to enjoin the mayor and board of supervisors of said City and County from collecting assessments levied for the construction of a tunnel through Buena Vista Park, and through, over, and upon a portion of Duboce Park. Buena Vista Park lies on a high ridge of land separating that part of San Francisco lying easterly of the eastern portal of the proposed tunnel and generally known as the "down town section," and a residential part of said city lying west of the western portal of said tunnel and known as the "Sunset district." The purpose of the tunnel is to provide a way of rapid transit between these two sections of the city.

Proceedings were taken by the board of supervisors under the provisions of the so-called "Tunnel Procedure Ordinance," resulting in the assessments complained of. Authority for the enactment of this ordinance is found in certain charter amendments adopted by the electors of the City and County of San Francisco in December, 1912, and ratified by the state legislature in 1913. (Stats. 1913, at p. 1621.) These amendments contain the following provisions relating to the construction of tunnels:

"Section 1. The Board of Supervisors are hereby empowered to order the construction of and construct any tunnel, subway or viaduct in, on, under or over any accepted

or unaccepted open public street, avenue, lane, alley, place or court within the City and County, or any other land of the City and County. . . . The board of supervisors may, by an affirmative vote of at least twelve of its members, adopt an ordinance which may from time to time be revised or amended, providing a method of procedure for such improvement, work and assessment and for the ascertainment and payment of damages and for the manner in which protests against such assessments and damages awarded may be heard and determined, and for the manner in which such assessment may be collected and paid and property delinquent thereunder may be sold, and for the procedure for fully and completely exercising the powers conferred in this section.''

On the trial of the cause the court gave judgment against plaintiffs, and upheld the validity of the proceedings. From this judgment the appeal herein was taken.

Appellants raise four points on appeal, contending respectively that:

I. The tunnel, if constructed, will necessitate the unlawful use of lands now used by the people as public parks, and held by the city in trust for such purpose.

II. The assessments are either levied on a fundamentally incorrect basis or are arbitrary and in disregard of actual benefits, and in either case constitute the taking of property in violation of the state and federal constitutions.

III. The assessments were not made by the same body which heard the protests, and the assessed land owners have never had a hearing before the board of supervisors which made the levy.

IV. The trial court, in excluding evidence offered by the plaintiffs, committed prejudicial error.

These questions will be discussed in the order stated.

In considering the question as to whether the construction of the proposed tunnel and its subsequent use as a street railway right of way would result in an unlawful use of a portion of the parks in, on, under, or over which the street-cars would run, the following facts established by the evidence are important:

It is proposed that a street-car line be constructed so as to enter Duboce Park on its easterly side, run a distance of 145 feet over the surface of the park to the commencement

of a cut 16 feet wide and 220 feet long, varying in height from a fraction of an inch to 21 feet, where the tracks will then enter the tunnel proper through its eastern portal. Preparation for laying the tracks would necessitate the removal of a 16-foot strip of the 19-foot sidewalk and curb on the eastern boundary of the park, the removal of all lawn, shrubs, and trees growing on a strip of land 16 feet wide by 365 feet in length, the obliteration of a portion of a 10-foot path across the proposed cut, the removal of the earth within the boundary of said cut, and the abandoning of at least that portion of the park occupied by the cut to exclusively railway uses. The tunnel proper would also be used exclusively as a street railway right of way. The portion of the park to be thus used is in the form of a narrow strip of land running along its southern boundary, constituting but a small fraction of the entire park area.

But little consideration need be given the situation which would exist in Buena Vista Park after the construction of the tunnel. At all points this tunnel will be entirely beneath the surface of the park at a depth ranging from 200 to 340 feet. The construction and use of this tunnel could not possibly interfere with the free or customary use of the park for any or all park purposes.

As to Duboce Park, however, conditions are, as pointed out above, different. An inquiry into the exact legal status of this park is therefore pertinent.

The lands embraced within its boundaries were originally part of the pueblo lands of the City of San Francisco. By virtue of certain ordinances passed by the common council of said city in 1855, ratified by the state legislature on March 11, 1858 [Stats. 1858, p. 52], and confirmed by act of Congress on July 1, 1864 [12 Stats. at Large, 333], these lands were dedicated to public use for the purposes of a hospital. (*City & County of San Francisco* v. *Sharp,* 125 Cal. 535 [58 Pac. 173].) That is to say, the lands were owned by the City and County of San Francisco "in trust for the use and benefit of the people of the state of California, and the inhabitants of the City and County of San Francisco for the purposes of a public hospital." The lands, however, were never put to use for hospital purposes.

In 1897 a board of freeholders of San Francisco, elected pursuant to the provisions of section 8, article XI, of the state constitution, prepared a charter for the City and County of San Francisco, which was ratified by the people in 1898 and confirmed by the legislature in 1899 (Stats. 1899, p. 241). By this charter it was provided (art. II, chap. II, sec. 31) that the board of supervisors shall have power "to transfer from one department of the city government vacant and unused lots of lands to another department." Acting under this authority, the board of supervisors, in the same year that the charter became effective, transferred the land previously held as hospital land, but thereafter known as Duboce Park, to the board of park commissioners.

On the subject of dedication the record is silent, except for a stipulation to the effect that on April 2, 1900, the board of supervisors passed an ordinance by which they named the lands in question Duboce Park, purported to set it apart as a park, and placed it under the jurisdiction of the park commissioners.

Article XIV, section 1, of the charter of the City and County of San Francisco provides that all the "parks and squares in the city and county . . . shall be under the exclusive management of a board of commissioners who shall be known and designated as park commissioners." Under the provisions of section 6 of said article the commission is given complete and exclusive control, management, and direction of the park and exclusive right to erect structures thereon, but it is expressly provided therein that no part of said park may be leased to any person, company, or corporation, nor shall any structures be erected thereon, by any one except the commissioners, and, further, that no structures shall be erected by the commissioners "except it be within the objects and purposes for which said parks, squares, avenues and grounds were dedicated to the public.". The park commissioners have continuously since April 2, 1900, exercised exclusive management and control over Duboce Park and have expended money from park commission funds for its improvement and maintenance as a park. Since its improvement and maintenance as a park it has been used as such by the public.

The terms of dedication of lands for park purposes and the manner of acquisition have an important bearing upon the uses to which such lands may be put. The rule, amply supported by cited authorities, is fairly expressed in 20 California Jurisprudence, page 466:

"A distinction is to be observed between cases where land for a public park or square was dedicated without special restriction and cases where the dedication was restricted to a particular purpose. Where the dedication was without restriction any usual, proper and reasonable public use may be made of the park; but where a particular purpose was expressed the land must be used accordingly. This distinction is clearly apparent where, on the one hand, land has been dedicated for park purposes by a private individual, and where, on the other hand, the municipal corporation holds the full title to the land for public uses without restriction. Where title is in an individual the land must be used as directed by him. But where the municipality holds the title for public uses, without restriction, the legislative power may regulate the purposes for which the public may use the land, so long as such use is consistent with park purposes."

From the foregoing it is apparent that the use to which Duboce Park, or any part thereof, may be put is not limited to any particularly specified use, but to use generally for park purposes. The language of the decisions seems to indicate that a park is a pleasure ground—a place of enjoyment and recreation and for the public generally. (*Hall* v. *Fairchild-Gilmore-Wilton Co.*, 66 Cal. App. 615 [227 Pac. 649].) It eliminates all idea of business or administrative uses, or enjoyment by a limited number of people.

Chief Justice Searls, in the case of *People* v. *Park & Ocean R. R. Co.*, 76 Cal., at page 160 [18 Pac. 141, 143], ably discusses a situation existing in Golden Gate Park, probably one of the greatest places for recreation and enjoyment in any city, when, in 1888, it was sought to abate as a nuisance the steam railroad running across a portion of the park, and to enjoin its use and operation. He said:

"A purpresture exists where one incloses or makes several to himself that which ought to be common to many.

"The title to the Golden Gate Park under the several acts cited is in the city and county of San Francisco. But it is dedicated to the use of the public. The city holds it in trust for the public use. The right of the public is to have the free use and enjoyment of the park as such.

"Whatever materially interferes with and unlawfully abridges this right of the public it is their right to have corrected.

"The unlawful construction of a railroad, a statue, or any building upon the park is a purpresture. But every purpresture is not a nuisance. It may or may not be a nuisance.

"In the case of a park, if it unlawfully obstructs the free passage or use in the customary manner of such park by the public, it is a nuisance, and may be abated as such by a court of equity.

"If it falls short of this, the remedy is not by the people, who are not injured, but by the holder of the legal title."

The question to be decided in that case was whether or not the railroad unlawfully obstructed the free passage over or use of the park in the customary manner by the public. The court found that the roadbed of the defendant railroad company passed through a portion of the park that had always been and then was unused, with the exception of about half an acre, which, until the construction of the road, had been used for the purposes of a temporary nursery; that all of the lands within the park occupied by said defendant had always been and then were generally unfrequented by visitors to the park, and that the construction, maintenance, and operation of the railroad in no way affected or obstructed the free and comfortable use and enjoyment of said park, or any portion thereof, in the customary manner by persons frequenting the same, and that the people of the state of California had not been prevented from going with safety and comfort from one part of the park to another. Following these findings the court held that

"A railroad in a public park, constructed and managed as in the case at bar, may be a nuisance, calling for the intervention of the supreme power of the state to conserve the rights of the general public; or it may be a medium of ingress, egress, and transportation essential to the full en-

joyment by the people of the privileges and blessings accorded them in the creation and dedication of such park. We deem the findings conclusive of the case, and are of the opinion they are supported by the evidence. . . . For any and all intrusions upon the park which work no injury to the public, the city and county of San Francisco, as the trustee holding the legal title, can alone maintain an action.''

In the case under consideration the witness, M. M. O'Shaughnessy, city engineer of the City and County of San Francisco, testified that the space to be used by the proposed tunnel and railway in Duboce Park is now mostly occupied by brush and shrub, and would not, in his judgment, impair the usefulness of the park in any way; that he had been in the park probably 20 times in the last three years and had never seen anybody in that portion of the park, and that it was unfrequented.

B. P. Lamb, the secretary of the board of park commissioners, called as a witness by the plaintiffs, testified on cross-examination that he was familiar with Duboce Park, had been there frequently, and that the portion in question was not a frequented part of the park.

M. J. Callahan, another witness, testified that he made a preliminary study of the park, visited it about 20 times—for a while nearly every day, and then every other day for about a month, and thereafter not less than once a week and sometimes twice a week; that the major portion of the surface of the ground within the area in question was occupied by high shrubs and trees growing densely together, and that in his opinion its use for tunnel purposes would not interfere with the use and enjoyment of the park.

Based on this evidence the court found

'' . . . that the area so to be occupied by said portal and approach consists of a strip about 16 feet wide measured at right angles to Duboce Avenue and about 220 feet long measured along the northerly line of Duboce Avenue; that said strip of land is along the southerly line of said so-called Duboce Park consisting of a lawn and a small amount of shrubbery; that all of said strip of land has always been and now is generally unfrequented by visitors to said so-called park and that the construction, maintenance and operation of said easterly portal, as aforesaid, as the same

is by said plan to be constructed, operated and maintained in nowise affects or will in nowise obstruct a free and comfortable use and enjoyment in the customary manner of the said so-called park or any portion thereof by all or any persons frequenting the same, nor will any person be prevented from going in safety and comfort from one part of said so-called park to another part thereof or from using and enjoying the same by reason thereof.''

While the expressed purpose for the construction of the Duboce tunnel was to facilitate transportation between two distant parts of the city, the construction of the tunnel and the street railroad leading thereto and therein would incidentally and to some extent at least be a medium of ingress, egress, and transportation, adding to the full enjoyment by the public of the privileges of the park.

In the light of the foregoing legal principles, the evidence and the findings of the court, we are of the opinion that the court was justified in making the finding above quoted, that the finding is supported by the evidence, and that the public use to which the small area of the park in question will be put when the proposed improvements are completed would not be so inconsistent with the purposes for which the park was dedicated as to constitute an unlawful use thereof.

In connection with the second point raised by appellants, namely, that the assessments complained of were so levied as to amount to the taking of property without due process, the following facts are to be considered:

While, as above stated, the object of the proposed tunnel is to provide a way of rapid transit between two sections of the City and County of San Francisco, one lying to the east and one to the west of said tunnel, the assessment district includes only lands west of the tunnel.

Within the boundaries of the assessment district itself are several parcels of land owned by various churches and religious bodies, upon which are constructed houses of worship used for religious purposes; also within said assessment district are several parcels of vacant land owned by the City and County of San Francisco. These are either school lands or lands reserved for fire department purposes. No assessment was levied against such church property or city

lands, although church lands devoted to purposes other than religious purposes were assessed.

In following the procedure provided for under the terms of the tunnel procedure ordinance opportunity was afforded by the board of supervisors for the filing and hearing of protests as to the extent of the proposed assessment district, the exclusion of lands therefrom, and any and all other matters in connection with the proposed tunnel construction to which interested parties might legally object.

Protests were filed by appellants herein and at a hearing thereon before the board, the points raised above as to the exclusion from assessment of church and city properties and lands lying east of the tunnel were fully presented. Witnesses were sworn and oral and documentary evidence introduced in support thereof, and thereafter the board of supervisors, in denying said protests, found and determined that the excluded lands would receive no benefit from the tunnel construction and that they should not be assessed for said work. Appellants contend that while the church lands and the city lands may not be subject to general taxation, they are nevertheless subject to assessment for specific benefits conferred by particular improvements. Respondents have no quarrel with this, and, indeed, when the distinction between general taxes and special assessments is considered in the light of legal authority, the correctness of such contention appears to be well established.

As to the exclusion of land east of the tunnel appellants have this to say: "It is beyond the realm of reason to say that a tunnel such as this, which is constructed between two points to provide rapid transit between such points, benefits only the land which is situate at one end."

As to the exclusion of church and city lands they contend that since such lands are subject to assessment, failure to assess them invalidates the other assessments for the reason that if the adjoining assessed lands within the district are benefited, the church and school lands must of necessity be also benefited, a finding to the contrary is unwarranted and untruthful, and the placing of the burden of the assessment from which such lands are freed upon the other lands in the district amounts to confiscation and to the taking of property without due process.

"Nor shall any state," reads the Fourteenth Amendment to the federal constitution, "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

A similar provision is contained in the constitution of California (art. I, sec. 13).

"Due process of law" has been variously defined. As was said in the case of *Jones* v. *Franklin County Commissioners*, 130 N. C. 465 [42 S. E., at p. 149];

"It is difficult to define with precision the exact meaning and scope of the phrase 'due process of law.' Any definition which could be given would probably fail to comprehend all the cases to which it would apply. It is probably wiser, as recently stated by Mr. Justice Miller, of the United States supreme court, to leave the meaning to be evolved 'by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded.' It may, however, be stated generally that due process of law requires an orderly proceeding, adapted to the nature of the case in which the citizen has had an opportunity to be heard, and to defend, enforce, and protect his rights. A hearing, or an opportunity to be heard is absolutely essential. We cannot conceive of due process of law without this. In his argument in the *Dartmouth College Case*, 4 Wheat. (U. S.) 519 [4 L. Ed. 629], Webster defined 'due process of law,' as a proceeding 'which proceeds upon inquiry, and renders judgment only after trial.' "

It cannot be said that the legislature of California in approving the charter amendments of 1912 violated the provisions of the Fourteenth Amendment, for the charter amendments direct that the tunnel procedure ordinance provide a method for the ascertainment and payment of damages and for the manner in which protests may be heard and determined. Neither did the board of supervisors violate the provisions of the Fourteenth Amendment when the ordinance was enacted for it followed the directions of the charter and made provision for such hearing and determination. The only question, therefore, is whether or not the board of supervisors in following the proceedings outlined by the tunnel procedure ordinance did something or failed

to do something which resulted in the taking of property without due process.

A case similar in many respects to the one under consideration is the case of *Larsen* v. *City & County of San Francisco*, 182 Cal. 1 [186 Pac. 757], wherein the validity of the assessment levied for the construction of Twin Peaks tunnel under the provisions of the tunnel procedure ordinance was attacked on several grounds. One of the grounds was that the assessment district as laid out included lands lying east of the tunnel and that such lands were not benefited. Another ground was that certain lands lying within the boundaries of the assessment district as finally fixed were excluded from assessment. The character of these lands does not appear from a reading of the printed decision, but respondents' counsel herein call attention to the fact that in the briefs of appellants filed with the supreme court in that case it is made to appear that the properties omitted from the assessment are, as in the case at bar, church properties. Be that as it may, the Larsen case is authority for the rule that under the language of the tunnel procedure ordinance, wherein the board of public works is directed to assess the total sum required for the improvements "upon the several lots of land benefited within the district or districts of assessment so that each of the lots shall be assessed in accordance with its benefits caused by such tunnel construction," the necessary implication arises that no benefits shall be assessed against any parcel which the said board may find is not benefited. The case further holds that where, as in the case at bar, the procedure outlined by the tunnel procedure ordinance has been strictly complied with, an opportunity for protests accorded and a hearing had, and thereafter a final determination made by the board of supervisors as to the lands benefited or to be benefited by the proposed improvement, such determination is presumed to be correct. The burden of proof rests upon the objectors to show errors in the decision except in so far as they are shown upon the face of the record. No appeal lying from the findings of the board of supervisors, their conclusion is final and conclusive except as against attack on the ground of fraud or mistake.

In the Larsen case the court said:

"The board of supervisors is the ultimate authority which is empowered to finally determine what lands are benefited and what amount of benefits shall be assessed against the several parcels benefited by the construction of the tunnel. This determination is made after a full hearing accorded to all persons interested to make such objection as they see fit. In such a case the court will not declare the assessment void unless it can plainly see from the face of the record, or from facts judicially known, that the assessment so finally confirmed is not proportional to the benefits, or that no benefits could accrue to the property assessed. . . . It must . . . be conceded that the determination of the supervisors is at least *prima facie* correct, and that it could not be set aside except upon evidence showing that the decision was not sustained by the facts existing. No evidence was offered or given to show that the particular lots not assessed for the improvement were in fact benefited thereby. In the absence of such evidence it is obvious that the decision of the supervisors could not be declared invalid."

In the instant case plaintiffs' complaint as amended contains no allegations of fraud or mistake, the allegations challenging the board's failure to assess upon all benefited lands in accordance with benefits conferred being to the effect the board's action was arbitrary rather than fraudulent. We take it that in the absence of a contest on the grounds of fraud or mistake it might properly be held that no extrinsic evidence was admissible for the purpose of showing the assessment invalid and that the trial court was limited to an examination of the face of the record itself in order to determine whether or not the lands excluded from assessment were in fact benefited.

"By the face of the record" is meant the face of the record of the proceedings of the board of supervisors. This record, so far as it appears, shows a strict compliance with the terms of the ordinance, a full hearing had upon the grounds of contest set forth herein, and a final judicial determination by the board after full consideration and hearing had that certain lands would not be benefited and that they should be excluded from assessment.

However, the trial court did admit extrinsic expert testimony as to whether or not the excluded lots would be bene-

fited. City Engineer O'Shaughnessy, who prepared the report of the board of public works, testified that in his opinion the lots would not be benefited. James H. Humphreys, a consulting engineer, one of the plaintiffs herein, testified that in his opinion they would be benefited.

The trial court found there would be no benefits. We believe this finding warranted from an examination of the face of the record showing that such conclusion was reached by the board of supervisors after due notice of protest and hearing, and, if competent and material, from the expert testimony admitted at the trial, the court being at liberty to adopt the views of either of the two experts.

The conclusion is therefore reached that the board, in acting under the provisions of the ordinance, neither failed to follow its provisions regarding due process nor did violence to the rule by acting in a purely arbitrary manner, as contended by appellants.

The facts pertinent to a discussion of appellants' third point, namely, that the assessments were not made by the same body which heard the protests are these:

The board of supervisors consists of eighteen members; no ordinance or resolution can be lawfully adopted unless finally passed by a majority of all the members; ten constitutes a majority.

The hearing of protests before the board of supervisors was held October 31, 1922, and on April 6, 1925, "at which time said hearing was resumed, finished and concluded"; the resolution modifying and confirming the report of the board of public works was passed by the board of supervisors on April 13, 1925; four of the members of the board which heard the protests on October 31, 1922, went out of office on January 7, 1924, and three of their successors, along with thirteen members of the old board, participated in a confirmation of the report and the fixing of the assessments.

Appellants contend that at the time the assessment was levied the board was acting judicially, that the members who had not heard the evidence were disqualified from acting, and that the mere fact of their disqualification invalidated the proceedings. As authority several English and sister state decisions are cited to the effect that a judgment participated in by one or more disqualified judges is without jurisdiction and therefore void. It must be conceded that

the board was acting not in an administrative, executive, or legislative capacity, but judicially or *quasi* judicially. It is true, however, that the authorities of other states are more or less divided on the subject of the invalidity or voidability of a decision where one who has not participated in the hearing joins in the rendition of such decision. So far as we have been able to determine there is no California decision on the subject.

The situation is clearly expressed in 33 Corpus Juris, at page 1023:

"Generally, the disqualification of a judge of a court composed of several judges renders him incapable of acting on the premises. It has been held that if a disqualified member of a court composed of several judges participate in the hearing and determination, it invalidates the decision, even though his presence was not required to constitute a quorum, and even though the ballot was such that the decision would have been the same had he not voted. However, there are cases holding that the mere presence of, and participation by, a judge disqualified to act in a particular case does not necessarily invalidate the proceeding, especially if his presence is not necessary to constitute a quorum, or his vote would not determine the result. Some cases have held that, where a disqualified member may sit with the court to make a quorum, if he does not participate in the decision it is valid."

Considering the fact that the resolution levying the assessment was passed by a board of supervisiors (a continuing body) acting in a judicial or *quasi*-judicial capacity and not by a court clothed with full judicial powers, and considering further that three more than the necessary majority of the old board voted for the resolution levying the assessment and that at least one hearing was had before the new board prior to its final action, and that the new members of the new board had more than a year for investigation and consideration before the final vote was cast, we believe the rule in this case should be that the assessment was not invalidated by the participation of the new members.

The remaining point raised by appellants that the trial court erred in excluding certain evidence we believe is not well taken. Appellants offered to prove that at the time the board was considering the proposition of constructing the

tunnel in question it also had under consideration the construction of another tunnel known as the Eureka Valley tunnel, the purpose of which was to connect approximately the same two sections of the city referred to herein by a different route and location. In that report it was recommended that the lands east of the downtown section should meet a proportionate share of the expense. This project was not put through. Appellants also offered to prove that in the Twin Peaks tunnel proceedings downtown property was assessed. The court refused to permit proof of these facts, and we believe properly so, as it must be clear that each project presents such a different set of facts that the recommendations or conclusions of one proceeding as to benefits are not conclusive or even persuasive in showing benefits or lack of benefits in another proceeding.

■ Error is also assigned in the ruling of the court permitting two witnesses to testify over appellants' objection that the portions of Buena Vista Park and Duboce Park to be used for railroad purposes would in no way interfere with the use of these parks for the purposes for which they were dedicated. It may be that the questions call for conclusions of law, but the facts were before the court, and if error at all we can see no harm in the court having allowed these expressions of opinion.

■ Appellants contend that although the witness O'Shaughnessy was permitted to give his opinion as to whether the exempted lands would or would not be benefited to the same extent as lands upon which assessments had been levied, the same privilege was denied plaintiffs' witness James H. Humphreys. It is true that the court made the ruling complained of, but it is also true that subsequently during the examination of the same witness the court allowed the following question and answer:

"Q. Now, are the properties that were owned by the city and by the religious bodies—would they be benefited in the same way that the adjoining property would be benefited by this tunnel? . . .

"A. It would."

■ Further error is assigned by reason of the court sustaining an objection to the following question asked the witness O'Shaughnessy on cross-examination: "If this property had been owned by a private individual which is now owned

by the city, you would have assessed it, wouldn't you?" The question is argumentative and calls for speculation, and its answer either one way or the other would have no material bearing on the case, particularly in the absence of the full record as to what the board of supervisors actually took into consideration when they determined the property in question was not benefited.

Neither do we believe the point well taken that the court erred in refusing to permit certain testimony in reference to the sale of church lands and city school lands. The fact that school lands were sold without the assessment district, if it be a fact, would have but a remote bearing upon the status of the school lands within the district, and as to the school lands within the district the record shows that a part thereof had been advertised for sale, although the witness testifying to this did not know whether or not sales had actually been consummated.

So far as the sale of church property is concerned a similar situation exists. The court sustained an objection to testimony concerning the sale of church property in other parts of San Francisco, but allowed the question to be asked as to the sale of church properties within the district. It so happened, however, that the witness from whom it was sought to elicit such information was not advised as to whether or not any such sales had been made.

Judgment affirmed.

Nourse, J., and Koford, P. J., concurred.