[S. F. No. 14721. In Bank.—March 1, 1934.]

UNION SUPPLY CO. (a Corporation), Respondent, v. GOUVERNEUR MORRIS et al., Appellants.

S. H. HOOKE et al., Respondents, v. GOUVERNEUR MORRIS et al., Appellants.

W. C. Theile for Appellants.

Silas W. Mack, John Thompson and J. W. Lenahan for Respondents.

THE COURT. — Defendants Gouverneur Morris and Ruth J. Wightman Morris, his wife, appeal from a judgment decreeing foreclosure of mechanics' and materialmen's lien on property in the city of Monterey, this state, record title to which stands in the name of Mrs. Morris. By said judgment the court decreed that defendants were indebted to plaintiffs S. H. Hooke and W. E. Hooke, building contractors, in the amount of $15,518.98, which represents the full balance due said contractors upon an oral agreement for the construction of extensive additions to appellants' residence, by the terms of which the contractors were to be paid all costs of construction plus ten per cent. The court adjudged that said contractors had a lien for $14,897.60, and that the balance of $621.38, which was the amount unpaid on the architect's fee, was unsecured because not included in the claim of lien filed. The judgment further decreed that the Union Supply Company, plaintiff in a suit separately filed, but consolidated for trial with the action brought by the contractors, held materialmen's and subcontractors' liens upon the Morris property for the amount of $11,670.69. This company furnished lumber which was used in the work of improvement, and was found by the court to be the holder by assignment of the claims of other materialmen and subcontractors in the total amount of $6,255.65. By reason of the fact that the sum of $15,518.98 found due the contractors, S. H. Hooke and W. E. Hooke, includes the amounts required to discharge all unpaid materialmen's and subcontractors' claims, the judgment provided that all payments made upon the judgment in favor of the Union Supply Company should *pro tanto* reduce the judgment in favor of the contractors.

A short time prior to June 5, 1930, the Morrises approached Mr. S. H. Hooke with reference to the construction of extensive alterations and additions to their residence, the nucleus of which was an adobe structure surviving from pioneer days and modernized to suit their needs. The grounds surrounding the residence cover almost an acre.

The plans for the new addition are not before us on this appeal, but it sufficiently appears from the testimony that the new wing built by the contractors herein constituted the central and by far the larger portion of the house as reconstructed. At their first conference Mr. and Mrs. Morris exhibited to Mr. Hooke a pencil sketch of a floor plan which they had drawn themselves. Mr. Hooke drew certain floor plans to scale. He advised the employment of an architect, and at his suggestion the services of Mr. Wesley Hastings were obtained. On or about June 5, 1930, the contractors commenced work. At that time the plans had not been completed, nor all details of the construction agreed upon.

The arrangement between the Morrises and Mr. Hooke was that he should be paid all costs of construction, including material, labor and incidental costs, plus ten per cent of such costs for supervising the improvement. W. E. Hooke is the son of S. H. Hooke. All negotiations were had with the elder Hooke, who had been a builder on the Monterey peninsula for many years and had previously done some work for the Morrises. Hooke testified that the Morrises did not fix any limit as to the price of the contemplated improvement. After the architect had made some drawings, Hooke made an estimate of $22,000-$25,000, which did not include the contractors' profit of ten per cent and was necessarily nothing more than a mere rough estimate, since the plans were far from complete. Mr. Morris claims that he definitely informed Hooke that it would be necessary for him to borrow funds with which to build; that he could not borrow more than $25,000 and expected with that sum to buy furnishings, as well as to construct the building. According to Morris it was definitely agreed that the cost of the building, including the contractors' commission, should not exceed $22,000, but that if it should cost less the owners should have the advantage of the saving. The actual costs of construction, found by the trial court to be reasonable, totaled $40,297.22, including the contractors' commission of ten per cent, of which sum the Morrises had paid $24,778.24, leaving the balance of $15,-518.98 unpaid.

Upon this appeal appellants Mr. and Mrs. Morris contend that the testimony of S. H. Hooke that the contract

price was not fixed at $22,000 is too inherently improbable to be given credence, and that as they have already paid a sum exceeding that figure they are indebted to the Hookes in no amount whatsoever. Any price limitation in the oral agreement between the owners and the contractors would not be binding upon materialmen and subcontractors, who in good faith and without notice thereof furnished materials or performed labor. The owner's liability is limited by the contract price only where the contract is recorded and a bond filed as provided by section 1183 of the Code of Civil Procedure. (17 Cal. Jur., pp. 47, 57.) In defense of the contractors' demand, and by way of counterclaim to secure damages against the contractors in the event it should be determined that the unpaid materialmen's and subcontractors' claims held by the Union Supply Company constituted valid liens against their property, the Morrises alleged that plaintiff S. H. Hooke falsely and fraudulently represented that the addition could be completed for $22,000, when he well knew that it would cost far more. They further alleged that the actual costs of construction were far in excess of the reasonable costs because of the misconduct and negligence of the contractors in permitting materialmen and subcontractors to charge the highest possible rates, thereby increasing their own commission, and that the contractors were further guilty of negligence and misconduct in failing to inform them fully of the building costs from time to time during the progress of the work.

The court found for the contractors as to these several issues raised by the answer and counterclaim of appellants. There is no evidence in the record which will sustain the charge that the contractors falsely and fraudulently gave a low estimate. On the question whether the figure of $22,000 was understood to be a mere estimate or a fixed limitation as to the maximum cost of construction, the trial court accepted the testimony of Hooke that it was a mere preliminary estimate. It seems improbable that he would have been willing to agree to a fixed limit at a time when the plans were far from complete and important items in the construction had not been decided upon. Mrs. Morris left Monterey on a trip to the South Seas a few days after construction commenced and did not return until about the time the building was completed, but Mr. Morris con-

tinued to reside on the premises. He was very active in observing all details of the construction and had very definite ideas as to what he desired. From time to time changes were made in the plans drawn by architect Hastings, and in a number of instances after certain portions of the work had been done in accordance with the directions of Morris he decided that something else would be preferable and the work was done over. The conduct of Morris, as testified to by Hooke and by the subcontractors and materialmen, indicates that his insistence throughout was that everything, down to the smallest detail, should be exactly as he and Mrs. Morris desired it, and that said contractors and materialmen were warranted in inferring that price was not a major consideration.

The court's findings that the several claims held by the Union Supply Company represented the reasonable value of the materials furnished and labor performed, negative the contention of appellants that the contractors by negligence and misconduct permitted the charges for said labor and materials to exceed their reasonable value. Said findings were based on the testimony of the persons and firms by whom the materials were furnished and services rendered to the effect that in all cases their bills were based on the prevailing retail prices and wage scales on the Monterey peninsula.

Objection is made on the ground that certain of the bills rendered by the materialmen and subcontractors did not contain an itemized account of the materials furnished and hours of labor rendered. The failure of the contractors to demand such itemized statements was one of the charges urged against them in a complaint filed by the Morrises with the Department of Professional and Vocational Standards and Registrar of Contractors. The building procedure adopted was not calculated to produce a building in the most economical manner. Specifications were not prepared in advance, nor was a building contract fixing a definite price drawn up. Competitive bids were not sought on materials and subcontracts. However, the construction without a formal contract or competitive bids was fully acquiesced in and agreed to by Mr. Morris, and it was at his request that work was commenced before the plans were completed. It is true that the contractors, in protecting the interests of the owners, should have main-

tained a closer check on the prices of materialmen and subcontractors. But in view of the finding of the trial court that the rates charged were reasonable, it cannot be said that the owners have suffered actionable damage. It is likewise true that the contractors should have rendered more complete statements to the owners during the progress of the work, but their omission in this particular is insufficient to relieve the owners from paying the reasonable value of materials and services which actually went into the building. It is agreed that its construction is superior, both as to workmanship and materials.

In support of their charge of fraud and negligence, appellants cite certain incidents. Respondent Hooke accepted a ten per cent rebate, amounting to $117, on the price charged the owners for certain hardwood. He attempted to justify this rebate on the ground that it had been necessary to make a number of trips to San Francisco in connection with procuring the wood. We cannot approve of the acceptance of this rebate. However, there is no evidence that he received a rebate in any other instance. He testified that he had not received a rebate from any other source, and the several materialmen and subcontractors who appeared upon the trial all testified that he had not asked for nor received rebates from them. As to the destruction of the time cards kept upon the job, the testimony was that they were turned in to the contractors' office at least once a week, posted in a permanent time-book, and then destroyed in accordance with the usual custom of the office. It also appeared that Hooke failed to give the owners credit for lumber of the value of $53 returned to the lumber-yard. But he testified that this was through inadvertence, and the error was corrected on the trial. These incidents fall far short of establishing a general fraudulent intent.

Appellants also contend that the lien claims of respondents were filed too late. Where the owner fails to record a notice of completion, lien claims may be filed within ninety days after completion of the work of improvement. (Sec. 1187, Code of Civil Procedure.) The claims herein were filed on February 17, 1931, which is just within the ninety-day period provided there is evidence in the record to sustain the court's finding that November 20, 1930, was the date of completion. Although the foreman

left the job on October 31, 1930, and the Morris family commenced to occupy the bedrooms in the new addition about that time, there is evidence that one Herrera, a laborer who had been working on the job, remained and received his wages from Hooke, and also that certain electrical fixtures were installed on November 20th. Although the work done after October 31st was principally outside the building, and consisted of completing the cistern, laying sidewalks and putting in drain-pipes, the work of improvement as undertaken by Hooke included work outside the building. A cesspool was built, drain-pipes were changed, grading and excavating were done, sidewalks placed, and an approach to a driveway constructed. It cannot be said that as a matter of law the trial court's finding that November 20, 1930, was the date of completion is without evidentiary support.

The court did not err in denying the motion for a new trial. The averments of the affidavits filed by appellants in support of their motion were controverted in the counter-affidavit filed on behalf of the respondent contractors. The trial court resolved the conflict in favor of respondents and its action cannot be disturbed by an appellate court.

Appellants further contend that plaintiff Union Supply Company has no lien rights upon the claims of the several materialmen and subcontractors of which the court found it to be the assignee, for the reason that the assignments by which it claims were made orally, and there were no written assignments of the liens. It is contended that a mechanic's lien is an interest in real property which can be transferred only by instrument in writing. It is settled in this state that a mechanic's lien, like a mortgage or judgment lien, is a mere incident of the debt secured and cannot be transferred apart therefrom. (*Duncan* v. *Hawn*, 104 Cal. 10 [37 Pac. 626]; *Rauer* v. *Fay*, 110 Cal. 361 [42 Pac. 902]; *California P. C. Co.* v. *Wentworth Hotel Co.*, 16 Cal. App. 692 [118 Pac. 103, 113]; *Pitman* v. *Walker*, 187 Cal. 667 [203 Pac. 739]; 17 Cal. Jur. 158; 3 Cal. Jur. 279; *Coon* v. *Shry*, 209 Cal. 612 [289 Pac. 815]; 18 Cal. Jur. 86.) Section 1084 of the Civil Code provides: "The transfer of a thing transfers all its incidents, unless expressly excepted; . . . " As to mortgage liens, there is a further specific code section which provides that "the as-

signment of a debt secured by mortgage carries with it the security''. (Sec. 2936, Civil Code.) It follows from the principle that the lien is an incident of the debt and passes with it by operation of law, that an express assignment of the security is not required. It passes with the debt which it secures, and an assignment which is sufficient to transfer the debt must carry with it the mortgage or other lien. In *Martin* v. *Mowlin,* 97 Eng. Rep. 658, 663, the English court declared:

''A mortgage is a charge upon the land; and whatever would give the money, will carry the estate in the land along with it, to every purpose. The estate in the land is the same thing as the money due upon it. It will be liable to debts; it will go to executors; it will pass by a will not made and executed with the solemnities required by the statute of frauds. The assignment of the debt, or forgiving it, will draw the land after it, as a consequence, nay, it would do it, though the debt were forgiven only by parol; for the right to the land would follow, notwithstanding the statute of frauds.''

In this state it has been held that the assignment of a note, or its indorsement and delivery, or delivery alone, carries with it a mortgage given as security therefor, although said mortgage covers real property. (*Hurt* v. *Wilson,* 38 Cal. 263; *Druke* v. *Heiken,* 61 Cal. 346 [44 Am. Rep. 553]; *Phelan* v. *Olney,* 6 Cal. 478; *Bennett* v. *Solomon,* 6 Cal. 134; *Gessner* v. *Palmateer,* 89 Cal. 89 [24 Pac. 608, 26 Pac. 789, 13 L. R. A. 187].)

There is no requirement that an assignment of a debt due a mechanic or materialman must be in writing. The code provides that ''a transfer may be made without writing in every case in which a writing is not expressly required by statute''. (Sec. 1052, Civil Code.) It follows that a valid oral assignment of the claim due the mechanic carries with it the lien which is an incident thereto. The early decision in *Ritter* v. *Stevenson,* 7 Cal. 388, holding that an assignment of a mechanic's lien must be in writing, is inconsistent with our later decisions covering mortgage liens on real property, and at variance with the principle that a lien is but an incident of the debt and follows a valid assignment of the debt.

340

If a mechanic's lien or a mortgage lien can be said to be an interest in real property within the meaning of section 1971 of the Code of Civil Procedure, said section nevertheless provides that an interest in real property cannot be transferred otherwise than "by operation of law", or by instrument in writing. An assignment of the debt for which the lien is security by operation of law carries with it the security.

The judgment is affirmed.