[S. F. No. 16429. In Bank.—October 28, 1940.]

CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation) et al., Petitioners, v. GERALD J. LI-NARES, as Secretary of Board of Park Commissioners, etc., Respondent.

John J. O'Toole, City Attorney, Walter A. Dold, Chief Deputy City Attorney, for Petitioners.

Royal E. Handlos for Respondent.

Livingston & Livingston, M. Mitchell Bourquin and Charles J. Wiseman as *Amici Curiae* on Behalf of Respondents.

SHENK, J.—This is an application for the writ of *mandamus* to compel the respondent, as Secretary of the Board of Park Commissioners of the City and County of San Francisco, to publish the call for bids and to receive sealed proposals for a fifty-year lease of the subsurface space beneath Union Square, for the purpose of erecting and constructing therein a public automobile garage and parking station.

As a return to the alternative writ the respondent has filed a general demurrer to the petition.

The Town of San Francisco, predecessor of the City and County of San Francisco, acquired title to this property prior to the admission of California into the Union. Acting under the authority of a resolution by the *ayuntamiento* or town council of San Francisco, John W. Geary, its first alcalde, on January 3, 1850, executed a deed conveying to the Town of

San Francisco the title to the land "bounded northerly by Post Street, easterly by Stockton Street, southerly by Geary Street, and westerly by Powell Street, the same being laid down on a map of the Town of San Francisco, as surveyed by William M. Eddy, Town Surveyor, as a 'public square'." The deed further confirmed "unto the said Town of San Francisco as a public reserve, forever, the said piece or parcel of land bounded and described as above".

The prior ownership of these and other lands by the pueblo of San Francisco and the authority of its officers, duly authorized, to convey title for common use, or for special purposes, or in full ownership in the grantee, was confirmed in 1860 in the case of *Hart v. Burnett*, 15 Cal. 530.

Since the execution of the deed of January 3, 1850, the property has been devoted exclusively to the uses of a public park or square. Under the present and prior provisions of the charter of the city and county, it has been under the management and control of the Board of Park Commissioners of the City and County. Section 41 of the charter provides as follows:

"Section 41. The commissioners shall have the complete and exclusive control, management, and direction of the parks, squares, avenues, grounds and recreation centers, now or hereafter placed under the charge of the commission, including exclusive right to erect and to superintend the erection of buildings and structures thereon, except as in this charter otherwise provided.

"The commissioners shall not lease any part of the lands under its control nor permit the building or maintenance or use of any structure on any park, square, avenue or ground, except for recreation purposes, and each letting or permit shall be subject to the approval of the board of supervisors by ordinance, *but the commission may lease to the highest responsible bidder for a term not to exceed fifty years and upon such other terms and conditions as it may determine, sub-surface space under any public park and the right and privilege to conduct and operate therein a public automobile parking station, provided that the said construction, when completed, and the operation will not be, in any material respect or degree, detrimental to the original purpose for which said park was dedicated or in contravention to the conditions of any grant under which said park might have been received.*

*The revenues derived from any such lease shall be credited to the park fund.*

''The commission shall have power to lease any stadium or recreation field under its jurisdiction for athletic contests and exhibitions and may permit the lessee to charge an admission fee.''

The city and county is asserting its power through the Board of Park Commissioners to proceed with the leasing of the subsurface of Union Square in accordance with the foregoing charter provision and particularly the portion thereof which we have italicized. The questions presented are whether the power to proceed as proposed is properly vested in the Board of Park Commissioners and whether the limitations on the exercise of that power arising under the deed have been observed.

In the adoption of section 41 of its charter the City and County of San Francisco acted under a constitutional grant of power so to do. (Const., secs. 8, 8a, 8½, art. XI.) In thus dealing with its own lands, the city and county was not restricted by any constitutional provision. The express grant of power to the Board of Park Commissioners must, therefore, be taken as complete and adequate for the purpose intended, unless the terms of the grant to the Town of San Francisco in 1850 were such as to thwart that purpose.

It will be noted that the language of section 41 of the charter clearly recognizes that the title to Union Square is held by the City and County subject to the right of the public to the perpetual use of the land for park purposes.

It will also be noted that the Town of San Francisco acquired the property, not as the grantee of a private party or individual, but as the result of a dedication by a public authority. The rule of construction is not the same in both instances. In *Slavich* v. *Hamilton,* 201 Cal. 299 [257 Pac. 60], wherein the question of the right to construct a veterans' memorial hall in a public park was involved, it was said: ''The uses to which park property may be devoted depend, to some extent, upon the manner of its acquisition, that is, whether dedicated by the donor, or purchased or condemned by the municipality. A different construction is placed upon dedications made by individuals from those made by the public. The former are construed strictly according to the terms of the grant, while in the latter cases a less strict construction is adopted. (*Harter* v. *San Jose,* 141 Cal. 659 [75

Pac. 344] ; *Spires* v. *City of Los Angeles*, 150 Cal. 64 [87 Pac. 1026, 11 Ann. Cas. 465].)''

In the Spires case, the city of Los Angeles, as successor to the pueblo of Los Angeles, held ''Central Park'' under a dedication by the public ''as a public place forever for the enjoyment of the community in general''. In approving the use of the land for library purposes and with reference to the foregoing words of dedication, the court said at page 66 :

''This was comprehensive language, and in construing the grant, or rather the extent of the terms of the dedication, no narrow and strict construction should be applied to limit the city in the uses to which the property dedicated may be devoted, as long as they are such as tend to further and promote the enjoyment of the people under the general dedication of the land for their benefit. And that the establishment of a public library, to which the visitors to the park have access, is consistent with such public enjoyment, and tends to enlarge it, we have no doubt.

''As matter of public knowledge, we are aware that the erection of hotels, restaurants, museums, art-galleries, zoological and botanical gardens, conservatories, and the like in public parks is common, and we are not pointed to any authority where it has been regarded as a diversion of the legitimate uses of the park to establish them, but, on the contrary, their establishment has been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit.''

In *Spinks* v. *City of Los Angeles*, 220 Cal. 336 [31 Pac. (2d) 193], it appeared that West Lake Park had been dedicated by the city charter in 1888 for park purposes, with the specific provision that this and other public parks should ''forever remain to the use of the public as such park or parks, inviolate and no part of said lands or real property shall ever be used or occupied for any other purpose''. The charter provision was amended in 1917 by adding the following: ''Provided, however, that the Board of Park Commissioners may, with the approval of the Council, given by ordinance . . . authorize the opening, establishment and maintenance of streets or other public ways in or through such parks; . . . '' In passing upon the power of the city to lay out a street across the park, and in construing the charter amendment, this court said:

"Where a tract of land is donated to a city with a restriction upon its use,—as, for instance, when it is donated or dedicated solely for a park—the city cannot legally divert the use of such property to purposes inconsistent with the terms of the grant. A less strict construction is adopted as to dedications made by the public. (*Slavich* v. *Hamilton*, 201 Cal. 299, 303 [257 Pac. 60].) The case here is not one of the type first referred to, in which a donor transfers property to a municipality for a fixed and definite purpose defined in the grant, and where the rule of strict construction is to be applied." ■ With the foregoing rules in mind, it must be concluded that the City and County of San Francisco holds Union Square by virtue of a dedication by the public and that there is nothing in the terms of the original grant which would deprive the city and county of the right to change the character of the use of the land so long as the contemplated use is not inconsistent with enjoyment by the public of the land for park purposes.

It appears from the petition that the perplexing problem of relieving traffic congestion in San Francisco has been the subject of much study and investigation. In the consideration of that problem as it existed in the so-called triangle district, it has been concluded by the public authorities and by the Street Traffic Advisory Board of the City and County of San Francisco that the construction of the public garage under Union Square will afford some relief.

Attached to the petition are a copy of the resolution of the Board of Park Commissioners, the call for bids, the proposed lease, the specifications for the finished surface of Union Square, a surface plan, a perspective, and elevations of Union Square. The resolution of the board discloses that the board has found and determined that the construction of a public automobile garage and parking station, when completed as proposed, and the operation thereof, will not be, in any material respect or degree, detrimental to the original purpose for which said park was dedicated, or in contravention of the conditions of any grant under which said park was received.

■ During the construction of the proposed garage and parking station in the subsurface of the square, it is apparent that there will be a temporary deprivation of a park use. This deprivation is brought about by reason of the necessary disturbance of the surface while the work is going on. The

period of construction is estimated to be about ten months. After construction the plan contemplates the restoration of the surface to its previous condition as a public park, with attractive landscaping and the usual public park facilities and conveniences. The only deviation from a complete restoration of the surface to use as a public park will be the permanent entrances and exits to and from the subsurface area on Post and Geary Streets. In this connection it appears that the present area of the park surface is 113,437½ square feet. The proposed surface for ingress and egress will occupy 7424 square feet, or approximately six and one-half per cent of the park surface.

It is the contention of the respondent that in the foregoing respects the construction and operation of the proposed improvement will be in a "material respect or degree, detrimental to the original purposes for which said park was dedicated" and in contravention of the grant under which the park property was received, and therefore unlawful. While it is true that during construction there will be an interference with the surface use, this interference will not be permanent and will continue only for a period of about ten months. Such a temporary interference would appear to be an unavoidable incident in carrying out the purposes of the plan. Likewise, the permanent use of about six and one-half per cent of the area of the square for ingress and egress is unavoidable and should not block the proceedings. The underground garage and parking station would be useless without an entrance and exit.

In *Harter* v. *San Jose,* 141 Cal. 659 [75 Pac. 344], the question of the power of the city to execute a lease for twenty-five years covering two and one-half acres of land in Alum Rock Park for hotel purposes was involved. The city charter authorized such a lease. The park was about 400 acres in area. The plaintiff sought to enjoin the execution of the lease on the ground that the construction of the hotel would "deprive plaintiff and the residents of said city of the free use of said park contrary to the terms of grant under which the city held the land", which was solely for public park purposes. The court refused to construe the grant against the proposed hotel use, calling attention to the fact that the dedication was, as here, not by private parties but by the public. (See, also, *Humphreys* v. *San Francisco,* 92 Cal. App. 69 [268 Pac. 388].)

We are satisfied that it is clearly within the charter powers of the Board of Park Commissioners to execute such a lease as the one proposed and that neither the temporary suspension of surface use during construction nor the permanent use of the small portion of the surface for entrances and exits would justify the court in denying the relief sought. ■ Furthermore, the fact that the respondent serves as secretary of the board and at the pleasure of the board does not deprive the petitioner of the right to prosecute the proceeding. (See *Golden Gate Bridge District v. Felt,* 214 Cal. 308 [5 Pac. (2d) 585].)

During oral argument, permission was granted to A. G. Curtis, as a taxpayer, to present a motion to intervene in the proceeding. In his petition he reiterates the contention of the respondent that the surface of the park will be withdrawn from public use for ten months during construction and that approximately six and one-half per cent of the surface of the park will be permanently withdrawn from public use, all of which it is alleged would be inconsistent with the uses to which the public square was dedicated. These contentions have been passed upon adversely in this opinion. There are no other allegations of fact presented in the application to intervene which would justify an order granting the same. The application is therefore denied.

Let the peremptory writ issue as prayed.

Gibson, C. J., Curtis, J., York, J., *pro tem.,* and Moore, J., *pro tem.,* concurred.

EDMONDS, J., Concurring.—I concur in the decision in so far as it concerns the city's title but I am so strongly opposed to the procedure by which a question of great public interest is conclusively decided, that I take this occasion to express my views concerning it.

The petitioners are the City and County of San Francisco and its Board of Park Commissioners, but the taxpayer who sought to intervene and is denied a hearing asserts that they are not the real parties in interest. He alleges that the plan to construct the garage was conceived, planned and promoted by private parties; that these parties have already formed a corporation known as the Union Square Garage Corporation to carry out the project; that the corporation has arranged to finance itself partly by the selling of private secu-

rities and partly by securing a loan from a governmental agency; and that it has induced the Board of Park Commissioners to take the present proceedings. This taxpayer also alleges that the private corporation will have the exclusive use and operation of the garage for a period of fifty years; that it will reap considerable profit therefrom; and that the city will receive no benefit except a moderate rental for the use of the premises during the term of the lease.

Although these allegations have nothing to do with the legal question concerning the authority of the city to lease the park premises, unquestionably the Secretary of the Park Commission, against whom the proceeding was brought, has refused to call for bids upon the proposed lease for the sole purpose of securing a judgment of this court approving the project. To accomplish this the city and its Park Commissioners have sued an appointed employee of the latter for the asserted purpose of compelling him to perform a purely ministerial act. The taxpayer charges that for these reasons the proceeding is a collusive one. Certainly it is not brought in such form as to allow a full and fair judicial examination of the merits of a project which will involve the expenditure of many thousands of dollars of public funds and have a great effect, for better or for worse, upon the growth of San Francisco's downtown area.

Carter, J., concurred.