[Civ. No. 13644.   First Dist., Div. One.   Nov. 8, 1948.]

R. H. McCULLOCH, Appellant, *v.* ALPHONSUS LIGUORI
et al., Respondents.

Ernest I. Spiegl for Appellant.

Norman S. Menifee for Respondents.

BRAY, J.—Plaintiff sued for damages for breach of contract. The court allowed no damages but gave judgment in

favor of plaintiff for the return of a $750 deposit. Plaintiff appealed from this judgment.

The action involves the failure of defendants to build and deliver possession to plaintiff of a building as provided in an agreement between the parties dated February 2, 1946. The portions of the agreement important here are as follows:

"AGREEMENT

"We, Alphonsus Liguori and Vera S. Liguori, his wife, hereby agree to lease to R. H. McCulloch . . . that building to be constructed on . . . [certain premises in] Redwood City . . . for a period of sixty (60) months at a total rental of $7500.00 payable as follows:

"$750.00 to be deposited upon signing this agreement.

" 125.00 to be paid upon taking possession of building.

" 125.00 to be paid each 30 days thereafter, for 54 months. "Lessors agree to use diligence in constructing the improvements to be placed on said lots and to deliver said premises at the earliest possible date; but same shall be done on or before May 1st, 1946. Said building shall be constructed according to plans and specifications to be furnished by lessors."

With the execution of the agreement, or shortly thereafter, defendants furnished plans and specifications for the building which were then and there approved and accepted by plaintiff. Defendants retained the only copy. Plaintiff paid the $750 down payment. Thereafter defendants entered into a contract with one Philip Hastings for the construction of the building. Defendants in their answer admit their failure to build the building as required by the agreement, but deny that they refused to build it. As defenses, defendants allege: (1) that any failure of completion of the building was through no fault of defendants but was due to the failure of Hastings, their building contractor, to complete the building in time; (2) that the delay in construction was caused by "governmental controls and federal regulations."

The building was not completed by May 1st, as agreed. On May 24th, plaintiff's attorney wrote defendants, complaining that the building was not ready as agreed, and also that plaintiff had been unable to learn defendants' plans as to compliance in the future. He offered to waive any claim for damages if defendants would assure him that the building would be ready within a reasonably short time. On May 27th, defendants answered that completion had been prevented by government restrictions and circumstances beyond

their control, and offered to return the deposit and release plaintiff from the agreement. They further stated that the building would be completed as soon as possible, and enclosed a check for $750, offering to release plaintiff from any further obligation on the contract. On May 31st, plaintiff answered, stating he did not accept the offer of release, returned the check, and demanded a statement as to whether defendants intended to perform their agreement, and if so, when.

No answer to this letter having been received, plaintiff on June 6th wrote defendants to the effect that plaintiff would hold defendants responsible in damages unless plaintiff received an assurance that the building would be ready for occupancy within a reasonable time.

On June 11th, defendants, through their attorney, replied to the effect that they were advised by their contractor that "he expected the work to proceed from this point on in the customary manner."

On July 5th, plaintiff notified defendants that because of defendants' failure to deliver possession of the premises as agreed and their further failure to advise plaintiff when, if at all, they intended to deliver the same, plaintiff elected to treat such failure as a material breach of the contract, and that that day he had entered into a five-year lease of comparable premises at a rental of $225 per month, a difference of $6,000 more than the total rental provided in the agreement between the parties. Demand was made for this and other claimed damages, as well as the return of the first payment.

The court found that defendants had failed to deliver the building as agreed but that such failure was excused because (1) it was the failure of the contractor and without any fault of defendants, and (2) it was caused by government controls and federal regulations, again through no fault of defendants, and because of matters beyond their control. The court further found that plaintiff was not damaged by any act or omission of the defendants, but was entitled to a return of the $750.

## FAILURE OF THE CONTRACTOR

█ Plaintiff moved to strike this defense from the answer. The motion was denied. It should have been granted. It is obvious that any fault of the builder with whom defendants had entered into a contract, to which the plaintiff was in no wise a party, could not excuse defendants from performing their agreement with plaintiff. █ Defendants have cited no authority to support their contention that a principal may

escape an obligation to a third party merely because of the default of his agent. There are none. ''Impossibility of performing a promise that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract.'' (Restatement of the Law, Contracts, p. 845.)

In *Hoag* v. *Jenan*, 86 Cal.App.2d 556 [195 P.2d 451], the court refused to support a defense to an agreement by an owner to enlarge a building for his tenant, based upon the inability of the owner's contractor to obtain the necessary building materials.

### GOVERNMENT REGULATIONS

Defendants have shifted their position since the trial of the case in respect to this defense. They alleged that the delay in construction of the building was caused by government controls and federal regulations. At the trial they attempted to prove that it was difficult to obtain materials because of these regulations. Now, on appeal, they claim that they established the doctrine of commercial frustration. It is doubtful if their answer sets up the defense of commercial frustration. However, assuming that it does, before considering the applicable law, let us examine the facts adduced at the trial.

One Welbanks, a general contractor, called by defendants, testified that prior to and at the time of the execution of the agreement, it was known to him and to all industry that labor and materials were scarce; that in February, March and April, 1946, the prevailing market conditions were such that the only way building materials could be bought was either on the black market or by breaking the law; that after the government conversion order went into effect materials could not be bought even with priorities; that commercial buildings could not get priorities. When asked as to when the conversion order went into effect, he said he thought it was about March. On cross-examination he stated that during that period Hastings completed other buildings of comparable nature, and he himself completed one, although the buildings were started the previous year.

One Lauman, witness for defendants, a contractor and builder, testified that in February, March and April, materials and labor were difficult to get, unless one waited a long time or went into the black market.

Hastings, the contractor employed by defendants, testified that about the 20th of March he entered into the agreement to build with defendants; that a ruling had been made by the War Production Board that 50 per cent of the materials could be bought over the counter and the other 50 per cent earmarked for priority building. The defendants' building did not have a priority. In March there was an order from the C.P.A. (successor to the War Production Board) to the effect that all industrial building would be stopped unless the foundation for a particular building had been laid, but the order did not apply to buildings costing less than $15,000. He obtained authority from the C.P.A. without a priority to proceed on the grounds that the cost of the building was below $15,000. He got materials by trading, but not sufficient to complete the building by May 1st. The contract price of the building was approximately $10,000. He started to prepare the ground for the foundation in the week of March 26th. Priorities were needed to buy lumber, but none for concrete. He completed another building in November, for which he took out a building permit in February.

In reviewing the evidence we are required to resolve all conflicts in favor of defendants and indulge in all reasonable inferences which may be drawn from evidence favoring defendants. Doing so, it appears that performance of the contract by May 1st, or at least by July 1st (plaintiff having waited until later than that before declaring a breach of the contract), was not impossible but difficult, and that there were no government regulations which actually prevented the performance of the contract. However, assuming that the evidence justifies the conclusion that the government regulation was directly responsible for delaying the completion of the building until the following January 1st, the fact that the parties contracted in view of the conditions as they existed at the time of the execution of the contract, and the delay of defendants and their contractor in immediately protecting themselves against the probable change in conditions, deprives them of any legal grounds for not fulfilling their contract. The agreement was entered into February 2d. In view of the short time provided for the delivery of the building, May 1st, it is significant that the building contract was not entered into between Hastings and defendants until about March 20th, and the actual construction did not start until the week of March 26th. This left only a month and a week to complete the building before the delivery date. The government regu-

lations upon which defendants rely did not take effect according to Hastings until March 26th. Had the defendants been at all diligent the contract would have been executed immediately after February 2d and the contractor could have obtained his materials and the building would have been well on its way to completion by March 26th.

In view of this situation, the doctrine of commercial frustration does not apply. ■ At the time the contract was executed, it was a matter of common knowledge, of which the court can take judicial notice, that there was a shortage of building materials and that, as we held in *Dorn* v. *Goetz*, 85 Cal.App.2d 407 [193 P.2d 121], the possibility of government regulations was reasonably foreseeable. Defendants' witnesses also testified to building material shortages in February and prior thereto. ■ Hence the doctrine of commercial frustration cannot apply, for "The courts have required a promisor seeking to excuse himself from performance of his obligations to prove that the risk of the frustrating event was not reasonably foreseeable and that the value of counterperformance is totally or nearly totally destroyed, for frustration is no defense if it was foreseeable or controllable by the promisor, or if counterperformance remains valuable. [Citing cases.]" "The purpose of a contract is to place the risks of performance upon the promisor, and the relation of the parties, terms of the contract, and circumstances surrounding its formation must be examined to determine whether it can be fairly inferred that the risk of the event that has supervened to cause the alleged frustration was not reasonably foreseeable. If it was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." "Thus laws or other governmental acts that make performance unprofitable or more difficult or expensive do not excuse the duty to perform a contractual obligation." (*Lloyd* v. *Murphy*, 25 Cal.2d 48, 54, 55 [153 P.2d 47].)

The building was completed on January 1, 1947. Taking the letters of plaintiff, in which he was asking for a statement as to when completion of the building could be expected, with the testimony of defendants, it is apparent that the defendants were anxious to return the deposit and call the whole deal off, rather than to give the plaintiff an opportunity to accept the building at a delayed date.

The defense alleged in defendants' answer concerning governmental regulations is not that building materials were

scarce because of regulations, but that the delay in construction was caused by such regulations. At no time were any regulations offered in evidence. Plaintiff constantly objected to defendants proving such regulations by hearsay evidence. However, assuming the regulations were as testified to by defendants' witnesses, there still were none which of themselves prohibited or delayed the construction. At most, they caused a scarcity of building materials and an increase in the cost of construction. "Mere difficulty, or unusual or unexpected expense would not excuse him." (*Carlson* v. *Sheehan*, 157 Cal. 692, 697 [109 P. 29].) "The courts, however, ordinarily take the attitude that parties should be careful about making contracts, and will not relieve them from performance for light and trivial reasons. The parties may have made an unfortunate arrangement, but when they have entered into it voluntarily, they are bound by it, in the absence of equitable grounds for avoidance. The parties must be presumed to have contracted with reference to existing conditions which are known to them. . . . Moreover, a person contracting with eyes open and aware of the facts is presumed to undertake performance at the risk of interference from agencies not expressly provided against." (6 Cal.Jur. p. 434.)

None of the cases cited by defendants supports their contention that they were excused from performance because of the building material shortage. *La Cumbre Golf & Country Club* v. *Santa Barbara Hotel Co.*, 205 Cal. 422 [271 P. 476], involved a contract by which the hotel company agreed to pay the golf club for the extension of privileges of the club to the guests of the hotel. The hotel burned down, and hence there were no longer any guests. The court held that the contract was necessarily based upon the continued existence of the hotel, and that the case came within the principle stated in 13 Corpus Juris, page 642, section 717d: "Where from the nature of the contract it is evident that the parties contracted on the basis of the continued existence of a person or thing, condition or state of things, to which it relates, the subsequent perishing of the person or thing, or cessation of the existence of the condition will excuse the performance, a condition to such effect being implied in spite of the fact that the promise may have been unqualified." Obviously that principle does not apply here.

*Johnson* v. *Atkins*, 53 Cal.App.2d 430 [127 P.2d 1027], holds that a contract for the sale of copra for shipment to a foreign country is terminated when the purpose of the pur-

chase is frustrated by the denial of such country of permission for entry. There is no analogy between the facts of that case and the instant one.

*20th Century Lites, Inc.* v. *Goodman,* 64 Cal.App.2d Supp. 938 [149 P.2d 88], considered a lease executed before the war for the installation and maintenance of a neon sign on a drive-in restaurant. After the war commenced the government prohibited all outside lighting, including electric signs, between sunset and sunrise. The court held that such government prohibition frustrated the desired object or effect that the parties intended to attain by the contract. There it is clear that the parties did not contract with the possibility of government regulation in mind.

*Christin* v. *Superior Court,* 9 Cal.2d 526 [71 P.2d 205, 112 A.L.R. 1153], concerned the time of dismissal of an action and had nothing to do with contracts.

In *Mineral Park Land Co.* v. *Howard,* 172 Cal. 289 [156 P. 458, L.R.A. 1916F 1], defendants contracted to take from plaintiff's ground all of the gravel necessary for the construction of a certain bridge. They took all above the water level, but to take that below the court found was impracticable as it could only have been done at a prohibitive cost. The court held that the defendants only agreed to take the gravel which was reasonably available, and that therefore because of the unavailability of the gravel, defendants were excused from further performance. The decision was based upon the rule that ". . . where performance depends upon the existence of a given thing, and such existence was assumed as the basis of the agreement, performance is excused to the extent that the thing ceases to exist or turns out to be nonexistent. (1 Beach on Contracts, sec. 217; 9 Cyc. 631.)" That rule has no applicability here.

*Lloyd* v. *Murphy, supra* [25 Cal.2d 48], contains an excellent compilation of the rules applicable to commercial frustration and the leading cases supporting such rules. While it is cited by defendants it is of no comfort to them, for it refused to apply the doctrine to a lease of premises to be used by an automobile agency which later was unable, because of government regulations, to get automobiles to sell. This refusal was based primarily upon the fact that the event was reasonably foreseeable.[1]

---

[1]See quotation from this case, *supra,* p. 372.

## DAMAGES

Inasmuch as defendants failed to deliver the building as agreed and had no legal excuse therefor, the court should have allowed plaintiff damages in addition to the return of the deposit. Plaintiff testified that he intended to use the building for manufacturing paper goods and that upon the execution of the agreement he ordered dies, machinery, and materials, such as paper, cards, etc. Most of this property arrived by May 1st, and he was forced to store it. Some he stored in his garage. He rented space at a tannery for the balance of it, paying $30 per month for such space. This amount he continued to pay until December when he moved in to the premises upon which he had obtained a lease. Plaintiff was entitled to recover this amount as special damages (104 A.L.R. 137; *Douglass* v. *Guardian Holding Corp.*, 132 Cal. App. 585 [23 P.2d 80]; *Kaye* v. *Melzer*, 87 Cal.App.2d 299 [197 P.2d 50])—seven months at $30, or a total of $210.

The general damage for breach of an agreement to lease is the difference between the agreed rental and the rental value for the term at the time of the breach. (*Peterson* v. *Larquier*, 84 Cal.App. 174 [257 P. 873].) It is sometimes expressed as "the fair value of the use of the premises." (104 A.L.R. 141.) The agreement here provided for a rental of $125 per month. Defendant Vera Liguori was asked if she knew the rental value of a similar building in September, 1946. She "presumed" that it would bring $225 to $250 per month, although she was not in the real estate business and the answer was not based on her experience. The witness Jacobson, a real estate broker called by plaintiff, testified that the rental value would be $225 and even $250 to $300 per month. Plaintiff testified that after considerable search the only comparable building he was able to lease required a monthly payment of $225. The witness Hastings, recalled on behalf of plaintiff, was asked concerning the rental of a building which he had testified was similar to the defendants' building, but with about 500 square feet less of floor space. He testified, over defendants' objection, that in February, 1946, he had leased his building at 3 cents per square foot. This, however, did not relate to rental values in May. Plaintiff, for the purposes of this appeal, waived his claim to damages other than the storage charge above mentioned, and the rental differential. Because there is no contradiction of the testimony that the rental value of the premises at the time of the

breach was $225 per month, plaintiff asks us to make findings to that effect.

■ Defendants contend that as plaintiff subleased the building which he eventually leased, they are entitled to have the damages reduced by the amount of the subrental. Plaintiff testified that he had subleased the building which he had leased after defendants' breach of their agreement, and that he was receiving $166.20 per month on a one-year term. In the agreement with defendants there is no provision against subletting. Therefore, defendants are not entitled to any credit for the amount received from the subtenant.

Inasmuch as the defendants failed to prove a legal excuse for their failure to deliver the building as agreed, and as there is no conflict in the evidence as to the rental value of the property at the time of the breach of the agreement and as to the storage charge necessarily incurred by plaintiff before he was able to rent a building, plaintiff should recover judgment for the $750 deposit, $210 special damages, and $6,000 general damages, totalling $6,960.

The judgment is reversed insofar as it denies recovery in excess of $750, and the trial court is directed to make findings of fact and conclusions of law and enter judgment in accordance with the views herein expressed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied December 8, 1948, and respondents' petition for a hearing by the Supreme Court was denied January 6, 1949. Schauer, J., voted for a hearing.