[Civ. No. 17681. First Dist., Div. One. June 19, 1958.]

GEORGE A. HAGGERTY, Appellant, v. CITY OF
OAKLAND, Respondent.

Guidotti & Mellana and Aldo P. Guidotti for Appellant.

J. Kerwin Rooney, Port Attorney, and Lloyd S. MacDonald, Deputy Port Attorney, for Respondent.

PETERS, P. J.—This case was originally assigned to Mr. Justice Bray for the preparation of an opinion. Mr. Justice Wood and I agreed with everything contained in the tentative opinion prepared by Mr. Justice Bray, except that we disagreed with his proposed disposition of the point involving the rule against perpetuities. Except for the point involving the rule against perpetuities, the opinion that follows has been prepared and written by Mr. Justice Bray:

In a taxpayer's action for injunction and declaratory relief, plaintiff appeals from a judgment in favor of defendant.

### QUESTIONS PRESENTED

1. Has the Board of Port Commissioners of the City of Oakland,[1] either directly under the city charter or through action of the city council, the power to construct and to lease a convention hall and banquet building in the port area?

2. Is the lease invalid (a) because of lack of proper controls; (b) because violative of the rule against perpetuities?

### RECORD

September 22, 1955, the board adopted resolution Number B4610. It declared that "public necessity and convenience and the interest of the Port" required that the city lease a building to be constructed in a certain portion of the Jack London Square area. The form of the lease as drawn by the port attorney was approved and the board secretary was directed to publish a notice calling for bids for the lease. April 23, 1956, the board adopted ordinance Number 957 awarding the lease to R. R. Goodman, doing business as Goodman Catering Company, the sole bidder. May 15th plaintiff filed this action for a declaration that the board's action was illegal, beyond the scope of its authority, and asking for a permanent injunction to restrain the board from proceeding with the construction and lease.

May 21st, the board adopted resolution Number B4981, requesting the city council to delegate to it the power to construct, maintain and lease facilities necessary for convention, banquet, or exposition purposes in the port area, and to ratify and approve the proceedings theretofore taken by the board for the construction and leasing of such facilities. June 7th, the city council adopted ordinance Number 4951 C.M.S. After finding that the construction of the proposed building was a necessary and desirable municipal project and

---

[1]Hereinafter called "the board."

that the leasing thereof was in the public interest, the ordinance conferred upon, delegated to and vested in the board the power to construct, maintain, operate and/or lease "such improvements, structures and facilities as shall be necessary or convenient, in its judgment and discretion, for convention, banquet or exposition purposes" in the port area. "The said Board shall further have and exercise and is hereby vested with all the powers, duties and functions in connection therewith as fully and completely as it would have, had such improvements, structures and facilities been expressly mentioned and set forth in the provisions of Article XXV of the Charter of the City of Oakland, and included therein as part of the facilities of the port, harbor and airport, the Council hereby finding and determining the same to be among the facilities and aids incidental to the development, promotion and operation of the port, harbor and airport and to the furtherance of commerce, transportation, shipping and navigation, and that such powers are necessary and convenient to carry out the general purposes of such Board." The ordinance then "ratified, confirmed and approved" the enactment of Port Ordinance Number 957 above mentioned. June 18th, the board adopted resolution Number 10004 approving the action of the city council in its ordinance Number 4951 C.M.S. *supra*, and accepting the powers and duties therein delegated and confirmed.

The lease is for a term of 10 years commencing from the completion of the building and requires the board to construct a convention hall and building, plans and specifications, for which are on file with the board and approved by the city engineer, to cost approximately $250,000. Lessee agrees to install equipment and furnishings of a value of not less than $80,000, removable at end of lease, if lessee is not in default. The premises are to be used "for the operation of a convention and banquet hall . . . for the preparation, sale and consumption of food (including foods and beverages for consumption off the demised premises), alcoholic and non-alcoholic beverages, tobacco products, curios and novelties, and for purposes generally consistent therewith and incidental thereto." The premises are not to be used for any event attended by less than 100 persons if food or beverages are sold or consumed. The monthly rental is $1,300 plus 4 per cent of gross receipts over $30,000 per month. Right to sublease is limited to a maximum of 10 days in any one case. The lessee is required to employ reasonable diligence "to promote and aid the com-

merce of the Port of Oakland and the use of its facilities. Other things being equal, . . . [lessee] shall ship through and receive through the municipal docks and terminals . . . all of the goods, materials and other commodities which it may be able to control or direct.''

The trial court upheld the validity of the proposed construction and lease.

1. *Power of Board.*

The city charter[2] provides (§ 212) that the board ''shall have the complete and exclusive power, and it shall be its duty for and on behalf of the City of Oakland: . . .

''(2) To make provision for the needs of commerce, shipping, and navigation of the port, to promote, develop, construct, reconstruct, alter, repair, maintain, equip and operate all waterfront properties including piers, wharves, sea walls, docks, basins, channels, slips, landings, warehouses, floating and other plants or works . . . and to establish, equip and operate all other facilities or aids incident to the development, protection and operation of the port, as may be deemed proper and desirable in its judgment, and it may modify its plans from time to time as the requirements of commerce, shipping and navigation may demand, and as part of such development and operation to provide for tugs, dredges, fireboats, barges, cold storage plants, and all other publicly owned facilities or appliances incident to the operation of the port, of such number and character, and in such places as the Board may deem feasible and proper.''

(4) To have control and jurisdiction of the port area and to ''enforce therein general rules and regulations, to the extent that may be necessary or requisite for port purposes and harbor development, and in carrying out the powers'' vested in the board.

''(14) To manage the business of the port and promote the maritime and commercial interests by proper advertisement of its advantages, and by the solicitation of business, within or without the port, within other states or in foreign countries, through such employees and agencies as it may deem expedient.''

''(15) To acquire in the name of the City of Oakland by purchase, condemnation, gift, lease, or otherwise take over and hold all lands, property, property rights, leases, or easements, and personal property of every kind, necessary or

---

[2]Stats. 1911, p. 1551, as amended.

convenient for the development and operation of the port, or for the carrying out of the powers herein granted to the Board.''

''(17) To enter into contracts, agreements, leases, or stipulations, germane to the scope of its powers and duties . . .''

''(24) To adopt and enforce such ordinances, orders, regulations and practices as are necessary for the proper administration and discharge of its duties and powers, or for the management and government of the port and its facilities. . . .''

''(26) To have and exercise on behalf of the City of Oakland all the rights, powers and duties in respect to the subject matters herein provided for, that are now or which may hereafter be vested in the City, or any of its departments or officers, or which may be provided for by general law.''

''(27) To do and perform any and all other acts and things which may be necessary and proper to carry out the general powers of the City or any of the provisions of this Article, and to exercise all powers not in conflict with the Constitution of the State, or with this Charter, germane to the scope of its powers, purposes and duties.''

''Operation of Facilities.

''Sec. 212a. Notwithstanding any other provision of this Charter to the contrary, the Board shall not be required to directly operate all of the properties, facilities and utilities under its control or jurisdiction, and shall have the power to authorize the operation of any of such properties, facilities and utilities by a private person, firm, association, or corporation, whether by lease, franchise, license, assignment, permit or otherwise, upon such terms and conditions as the Board shall prescribe, which terms and conditions shall include control over the rates, charges and practices of said private party to the extent permitted by law.''

Plaintiff concedes that the city council under section 39 of the city charter dealing with its powers and under subdivision 15 of section 212[3] would have the authority to construct the proposed facility and to lease it, provided the lease contained proper controls[4] but contends that the board has no such

---

[3]This subdivision empowers the board to transfer to the council any lands within the board's jurisdiction which it deems unnecessary for port purposes or harbor development.

[4]It is well established in California that the construction of a building with banquet and convention facilities and its leasing to private concerns by a municipality is a proper municipal function. *Sacramento Chamber of Commerce* v. *Stephens,* 212 Cal. 607 [299 P. 728]; *Futterer* v. *City of Sacramento,* 196 Cal. 248 [237 P. 48]. See also *Harter* v. *San Jose,* 141

power under the charter and that the city council cannot give it such power, as he claims that the construction and maintenance of a convention and banquet hall is not a port purpose.

We concur with the finding in ordinance Number 4951 C.M.S. that the construction of a convention and banquet building in the port area is a facility and aid "incidental to the development, promotion and operation of the port, harbor . . . and to the furtherance of commerce, transportation, shipping and navigation . . ." It gives trade, shipping and commercial associations a place to meet or hold conventions and exhibitions in Oakland's port area. By such activities the commerce of the port will be promoted by encouraging those associations to become familiar with the port and its assets. The port has already built extensive facilities to accommodate and promote commerce and navigation, which facilities are occupied by tenants engaged in industries related to port and airport activities. The proposed facility will provide a place for these tenants as well as all other interested persons, to meet, exchange ideas, exhibit their products and have the functions which are necessarily incidental to such meetings. The board is given broad powers to develop the harbor area and the promotion of commerce and shipping, and the proposed facility would contribute to such development. It would be a method of advertising the advantages of the port, of special value as the facility will be located in the very area of the port and harbor activities.

While it is true that the use of the facility is not limited to commercial associations and can be rented by other groups, such fact does not detract from its real purpose or the validity of the project. No facility of this kind in any city could expect to be used full time by commercial associations. There would be a considerable economic loss to the city if it were limited to that use. Good judgment would allow the use of the facility by other groups when not required by commercial associations, and therefore, such use would be incidental to the main purpose and "germane to the scope of its [the board's] powers and duties." (Charter, § 212, subd. 17.) See *City & County of San Francisco* v. *Linares,* 16 Cal.2d 441,

Cal. 659 [75 P. 344], (city leasing portions of a public park for hotel purposes). The general rule is that a municipality may erect stadiums and auditoriums for various uses, including conventions, without a violation of any constitutional or charter restrictions and without exceeding charter or corporate powers. See 10 McQuillin, Municipal Corporations, 3rd ed., § 28.14, p. 33; 173 A.L.R. 415.

445 [106 P.2d 369], pointing out that the creation of hotels and restaurants in public parks " ' . . . has been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit.' " The facility proposed in our case is likewise ancillary to the complete enjoyment by the public of the port properties.

The charter provisions give the board wide discretion in carrying out the powers entrusted to it. Courts cannot interfere with the action of the board unless it appears that the board has exceeded its powers or has abused its discretion. We find no such situation here.

Plaintiff's contention that under the charter, the city council and not the port is the governing body vested with general legislative authority to deal with port affairs is answered in *City of Oakland* v. *Hogan* (1940), 41 Cal.App.2d 333, 344 [106 P.2d 987]: "Under our modern form of government, particularly in larger communities, legislative functions are often bestowed upon more than one commission or board, as for instance, boards of health, education, park, police, waterway or other public bodies, which give to the matters before them specialized study and enact and enforce ordinances in the interests of the public with the same effect and in the same manner as if enacted by the principal legislative body of the corporation. (McQuillin on Municipal Corporations, 2d ed., revised, vol. 2, pp. 742, 743, § 707.) In the present case the 'Port Department' is not only a legislative body of the municipality of Oakland, but it is the body given exclusive control over port matters."

As the project is within the charter purpose of development of the harbor and port area, ordinance Number 4951 C.M.S. delegating to the board the authority to construct and lease banquet and convention facilities in the port area and confirming and ratifying the action of the board in that respect, ended any question of the power of the board under the charter to construct and lease the facility if any question existed. As said in *Mott* v. *Horstmann*, 36 Cal.2d 388 [224 P.2d 11], "It is the general rule that a governmental body may effectively ratify what it could theretofore have lawfully authorized. This rule has been applied to numerous situations involving municipal corporation contracts . . ." (P. 391.) Thus, not only did the board have the power under the charter but if that were necessary, it was expressly delegated the power as an agency of the city.

Plaintiff contends the ratification was not properly

made, relying on *Mott* v. *Horstmann, supra*, 36 Cal.2d 388, which holds ''The doctrine of ratification is subject to the limitation that the subsequent ratification should be made with the same formalities required for the original exercise of the power.'' (P. 391.) He claims that to make ordinance Number 4951 C.M.S. valid, the city council should have submitted the lease to competitive bidding. We can find in the charter no requirement that to delegate additional powers to an agency of the city or to ratify its acts any such procedure is necessary. The only formalities required in connection with the procedure of ratification are that the city shall act by ordinance (charter § 227) and that the board shall act by resolution (§ 210.) These formalities were complied with. Section 178 provides that no lease may be entered into except by ordinance to take effect 60 days after the ordinance granting it becomes final. This is to permit the filing of a referendum. Here the lease has not yet been entered into. No referendum was filed during the 60-day period.

2. (a) *Controls in Lease.*

 Plaintiff contends that controls to insure that the use of the property will be in the public interest are lacking, bringing the cause within the rule of *City & County of San Francisco* v. *Ross*, 44 Cal.2d 52 [279 P.2d 529], which held a proposed lease of garage facilities void for lack of controls by the municipality.

The instant case is distinguishable from the Ross case in that the lease provides definite controls. Some of these will be mentioned. Thus it provides that the premises shall be used for the operation of a convention and banquet hall and ''Lessee shall not use or permit the demised premises to be used in whole or in part . . . other than as hereinabove set forth, except with the prior written consent of the Port evidenced by resolution of its board . . .'' If food and beverages are to be served the use of the premises is limited to 100 or more people. This is applicable to any event, convention or banquet and appears to be in line with the public purpose. The lessee is bound to provide products and services equal to comparable establishments in the vicinity and at comparable reasonable prices and without discrimination. The port has the right to inspect ''menus, lists and schedules of prices'' and if any price is determined unreasonable or inappropriate for the services rendered or the item sold, the same must be modified as directed by the port. There is a provision that the lessee

may sublet for convention or other purposes consistent with the uses defined in the lease, but not to exceed 10 days, and then only if three days' prior notification is given to the port manager and he does not disapprove the proposed sublease. The provision is that the lessee may sublet for limited periods not to exceed 10 days "for convention or other purposes consistent with the use of the demised premises as specified . . ., provided always, that at least three (3) days' prior written notice of intention to so sublet shall be given to the Port Manager of Lessor, *and the said Port Manager shall not during said three-day period disapprove said sublease . . .*" (Emphasis added.) While this clause might have been worded better, its plain meaning is that the lessee may sublet provided that within the three days after notice the port manager shall not disapprove the sublease, and that if he disapproves, the sublease may not be made. By this veto power the port manager, if desired, can require priority of sublease for conventions as distinguished from other uses of the premises. It is clear that the port has the right of control to see that the premises are used primarily for convention or banquet purposes and that the port has control of prices, charges, etc. The requirement that all subleases be upon notice to the port manager and his right to disapprove a sublease ensures that conventions desiring to use the premises and approved by the port manager will not be denied such use.

The only use over which there appears to be no right of control reserved by the port is the use of premises for preparing foods and beverages for consumption off the premises. The lessee is expressly given the right to carry on a private catering service from the premises. Such a service is an adjunct of the banquet facilities required to be furnished by the lessee and redounds to the benefit of the port in that it will obtain revenue as under the lease the receipts from such business will be included in the gross receipts for the purpose of determining the amount of rent. As there is a substantial public purpose for which the lease is made, the port as an administrative body has wide discretion in determining what adjuncts may be permitted which will inhere to the advantage of the city in the operation of the main facility.

The premises may not be used in violation of "any present or future laws, ordinances, general rules or regulations at any time applicable thereto of any public or governmental authority, including the City of Oakland or its Board of Port Commissioners, relating to sanitation or the public health, safety or

welfare, or navigation and use of the harbor . . ." The premises are to be kept at all times in "a clean, wholesome and sanitary condition . . ." The lessee's "rights hereunder are non-exclusive for the Port Area . . . the Port retains the right to lease or license restaurants, convention and/or banquet halls and other similar operations within the Port Area." "Lessee shall in good faith and with all reasonable diligence employ its best endeavors and all practical means to promote and aid the commerce of the Port of Oakland and the use of its facilities."

The controls above mentioned, as well as the others contained in the lease, meet the requirement of the Ross case, *supra* (44 Cal.2d 52), that the municipal lease provide for control of rates, charges and practices of the lessee.

2 (b) *The Rule Against Perpetuities.*

Plaintiff contends that, because the lease provides that it is not to commence until the completion of the building, which event is uncertain and indefinite, and may, conceivably, occur later than 21 years after a life in being, the rule against perpetuities has been violated. We agree with this contention.

Section 715.2 of the Civil Code, enacted in 1951, provides: "No interest in real or personal property shall be good unless it must vest, if at all, not later than 21 years after some life in being at the creation of the interest and any period of gestation involved in the situation to which the limitation applies. . . . It is intended by the enactment of this section to make effective in this State the American common-law rule against perpetuities."

Although this statute was not enacted until 1951, the rule stated therein has been the rule in this state since the adoption of article XX, section 9, of the state Constitution. (*Estate of Sahlender,* 89 Cal.App.2d 329 [201 P.2d 69]; *Dallapi* v. *Campbell,* 45 Cal.App.2d 541 [114 P.2d 646].) The code section did no more than to put into statutory form the rule already in effect by virtue of the constitutional provision. (*Victory Oil Co.* v. *Hancock Oil Co.,* 125 Cal.App.2d 222 [270 P.2d 604].)

There can be no doubt that leases fall within the rule requiring estates to vest within the prescribed period. (*Epstein* v. *Zahloute,* 99 Cal.App.2d 738 [222 P.2d 318]; *Dallapi* v. *Campbell,* 45 Cal.App.2d 541 [114 P.2d 646]; see cases collected 41 Am.Jur. p. 78, § 34.)

█ It is also well settled that, in determining whether or not the rule applies, the courts have no power to consider reasonable probabilities or possibilities, or to consider what has happened after the creation of the interest. If, at the time of the creation of the interest, there exists any possibility at all that the interest involved may not vest within the prescribed period, the rule has been violated, and the grant must fail. This well-settled rule is stated as follows in 38 California Jurisprudence 2d page 481, section 29:

"The question whether the rules forbidding perpetuities are violated is to be determined in the light of the possibilities existing at the time of creation of the interest, and mere probabilities have no relevance. If, at that time, any possibility exists that the ownership will not vest within . . . the permissible period, a violation results, though such possibility be extremely remote. The fact that events have occurred subsequently to such creation which establish that the initial possibility of violation cannot occur is immaterial."

As late as November of 1956 the Supreme Court restated this rule in a case involving the related rule prohibiting restraints on alienation (see Civ. Code, § 715.1) in the case of *Estate of Johnston,* 47 Cal.2d 265 [303 P.2d 1]. At page 270 the court stated:

"It is likewise settled that it is not the probability of a violation of rules against remoteness or restraints on alienation that brings such rules into operation, but only the bare possibility as such possibility exists at the date of the inception of the trust."

In the *Estate of Sahlender,* 89 Cal.App.2d 329 [201 P.2d 69], there was involved a remainder bequest to the possible issue of one Dora, who was 55 years of age and a childless widow at the time of the death of the grantor. It was held that such a bequest violated the rule. At page 348 the court stated:

"These possibilities render the remainder bequests to the possible issue of Dora . . . void because in violation of the rule against remoteness of vesting. This is so even though Dora was 55 years of age at her father's death and was then a childless widow. The possibility of her having issue is extremely remote. But on the issue of validity of a trust it is never presumed that a woman, no matter how aged, is incapable of bearing children. [Citing a case.] Moreover, it is not the 'probability' of a violation of the rules against remoteness or restraints on alienation that brings such rules into opera-

tion, but only the bare 'possibility' as such 'possibility' exists at the date of the inception of the trust. [Citing two cases.]''

How do these rules apply to the instant case? In paragraph 2 the lease provides that the term shall be 10 years from the commencement of the term as prescribed in paragraph 14. That paragraph provides that when the building is substantially complete and ready for occupancy the Port of Oakland shall give written notice to the lessee. The term is then to commence from the first day of the calendar month next succeeding thirty days after the notice is given. Thus, the commencement of the term of the lease is dependent upon the completion of the building. That event is uncertain and indefinite, and subject to many possible delays. Obviously, there is a ''bare possibility'' that the estate granted by the lease will not commence within 21 years. Thus, the rule has been violated.

In an attempt to escape the logic of this reasoning, the defendant argues that the lessee obtained a vested right upon the final adoption of the ordinance awarding the lease, and then contends, correctly, that the rule against perpetuities does not apply to a vested interest even though that interest may not come into possession within the period of the rule. The difficulty with this argument is that the interest created by the lease is not a vested interest.

Civil Code, section 694, provides that a ''future interest is vested when there is a person in being who would have a right, defeasible or indefeasible, to the immediate possession of the property, upon the ceasing of the intermediate or precedent interest.'' Section 695 of that code provides that a future interest ''is contingent, whilst the person in whom, or the event upon which, it is limited to take effect remains uncertain.'' In the instant case the person who has the right is certain, but the right is not to take effect upon the ceasing of any intermediate interest, that is, the lease is not to take effect upon the termination of any present possessory interest. But the event upon which the tenancy is to take effect is limited upon an uncertain event, that is, the completion of the building. Such an interest is not vested.

There seem to be relatively few cases discussing this problem, but the recognized legal authorities in the field of future interests agree that such an interest is not vested, and that, if a lease for years is granted to take effect on a condition precedent which may not occur within the period of the rule, it violates the rule and must fall. (See Simes and Smith, The

Law of Future Interests (2d ed.) p. 153, § 1242; Gray, The Rule Against Perpetuities (4th ed.) p. 353; 2 Tiffany, Real Property (3d ed.) p. 170, at p. 171, § 406.)

The case of *Johnson* v. *Preston*, 226 Ill. 447 [80 N.E. 1001, 10 L.R.A.N.S. 564], is closely in point. There a testatrix devised realty to a trustee for "twenty-five (25) years from and after the date of the probate of this will." Obviously, the possibility that the will would not be probated within 21 years was extremely remote. Nevertheless, the court held that, since the date of this event was uncertain, the devise was void because in violation of the rule against perpetuities. The court stated (p. 1004): "Terms of years may be created to commence in futuro; but, if the condition upon which they are to arise is uncertain, and may not happen within the limits fixed by the rule against perpetuities, such terms are void."

In the instant case the only question presented is whether, when the lease was executed, there was any possibility, no matter how remote, that the estate might not vest within 21 years. With an uncertain and unfixed commencement date such a possibility exists. The possibility may be extremely remote and highly improbable, but that is not the question. The court should not and properly cannot speculate on this problem. If the slightest possibility exists that the estate will not vest within the prescribed period, the rule has been violated.

The argument to the contrary is ingenious. It is that the lease requires the Port to plan and to construct the building with "due diligence." This means, it is argued, that there must be implied a provision that this must be done within a "reasonable time." Twenty-one years, it is contended, is an unreasonable time. If, because of any emergency now not foreseeable, the building is not completed within 21 years, the purpose of the contracting parties would be frustrated and the lease would fail. Thus, it is argued, the lease must either vest or fail within 21 years. It is implied that the argument to the contrary is purely legalistic, and formalistic.

This argument is deceptively simple, and is unsound. The courts are not permitted to relax the rule against perpetuities. The people have spoken by adopting the constitutional provision, and the Legislature has reaffirmed that position as late as 1951. The rule itself contains no exceptions, and the courts should not create them. The rule has developed over a long period of time. It is predicated on fundamental principles of public policy. Once an exception is created to the appli-

cation of the rule, no matter how innocuous it may seem, no one can foretell where it may lead, or how it may be abused. It may be that, tested by practical considerations, no particular harm would result if this court were to except this case from the application of the rule because we know that in all probability the lease will vest long before 21 years. But that is not the test. It is equally true that we know that it is practically impossible for an aged woman to have children, but we also know that the "bare possibility" that she might, invalidates the trust. If these baby cases were correctly decided, and it is submitted that they were, then the present lease be thwarted by judicial legislation. Under the circumstances, must fail. Otherwise, the public policy of this state would we must impose upon the parties the penalty that is the result of their own oversight, and require them, if they so desire, to renegotiate the lease.

The judgment appealed from is reversed.

Wood (Fred B.), J., concurred.

BRAY, J.—I dissent from that portion of the majority opinion which holds that there is a possibility under modern conditions and concepts of the lease existing for 21 years without either vesting (that is, its term commencing) or failing. I agree with everything said in the majority opinion concerning the rule against perpetuities, the advisability of preserving it, and that it applies where there is only a "bare possibility" of the 21-year period being exceeded. Where I differ with the majority is in their holding as a fact that there is such possibility here. In considering this lease we first must determine its starting date. While it contains no definite starting date, it does provide: "The Port shall and will in good faith immediately after the execution of this lease proceed with plans for the construction and construct a convention and banquet hall building upon said premises, and shall thereafter prosecute the same to completion with all due diligence."[1] When the building is substantially completed and ready for occupancy, lessor is required to notify lessee and on the first day of the calendar month next succeeding 30 days thereafter, the term of the lease commences. The construction of the building must be started and the building completed with all due diligence. Provisions of this kind are

---

[1]The construction is to be substantially in accordance with preliminary drawings, plans and specifications on file with the board.

construed as requiring performance within a reasonable time. (See 17 C.J.S. p. 819; see also *Imperial Water Co.* v. *Cameron*, 67 Cal.App. 591 [228 P. 678].) No one would contend that taking 21 years to build the building required by the lease would be building it within a reasonable time.) As stated in the majority opinion, section 715.2, Civil Code, applies to leases and the vesting of an interest in real property required by that section will not occur here until the building is constructed and notice of its readiness for occupancy given. (Civ. Code, §§ 694, 695.) Nevertheless there is no possibility that the vesting would be prolonged 21 years. To bring the lease within the "bare possibility" rule, it has been suggested that there might be a possibility, before the building is completed, of our country becoming engaged in a war that might last 21 years, delaying the completion that long, thereby violating the rule against remoteness of vesting. Assuming, however, that there is a "bare possibility" of the construction of the building being held up by war for 21 years (something that never has occurred in the history of this country, and something which if it occurred would so change conditions of the country that all leases and contracts would go by the board), there is another rule applying to the vesting rule which would be applicable here. That rule is expressed in The Law of Future Interests, Simes and Smith, 2d ed., section 1231: ". . . a contingent future interest need not be certain to vest within the period of the rule in order to be valid, but merely must be certain *to vest or fail* within that period . . ." (Emphasis added.) A 21 year war or one extending anywhere near that length of time, or any other delay of construction for such period, would cause a complete termination of the lease and therefore there would be a failure of vesting, long before the statutory period would end. It is inconceivable and beyond a "bare possibility" that both parties in the event of such a protraction of the starting date of the lease would not be completely frustrated, thereby terminating it. It is also inconceivable that conditions or the position of the parties would be such that the lease would not fall of its own weight long before 21 years had elapsed. Obviously it is the object of both parties to this lease that its term begin within a reasonable time. A protracted postponement of that term would necessarily constitute a "frustration" in law and would bring the situation within the following quotation from *Brown* v. *Oshiro*, 68 Cal.App.2d 393, 397 [156 P.2d 976]: "Williston on Contracts (rev. ed., vol. 6, pp. 5486-5487) states the rule in

this language: 'Even more clearly with respect to leases than in regard to ordinary contracts the applicability of the doctrine of frustration depends upon the total or nearly total destruction of the purpose for which, *in the contemplation of both parties*, the transaction was entered into.' (Italics added.)''[2] There is no possible construction of the requirement of the lease that the building be completed within a reasonable time that would hold that more than 21 years is a reasonable time. The only possible construction is that the term must commence (that is, the building must be completed) long before the expiration of 21 years, or the lease will fail.

The situation here is different from that in cases where the question of remoteness of vesting depends upon the possibility of issue. There for various reasons including that of having a "convenient rule of practice" (see *Fletcher* v. *Los Angeles Trust etc. Bank,* 182 Cal. 177, 182 [187 P. 425]), the common law adopted the conclusive presumption that a possibility of issue is commensurate with life. This rule has been continued in America, although it is no longer rigidly enforced in England as to termination of trusts. (See *Fletcher* v. *Los Angeles Trust etc. Bank, supra,* 182 Cal. 177, 182.) There is no presumption applicable in our case.

To hold that under modern economic conditions there is even a bare possibility that a landlord and tenant, and particularly a landlord which is a political subdivision of the state and a tenant who is a business man, would ever wait over 21 years for their lease to take effect, is unrealistic, fantastic and even absurd. After all, there has to be some common sense in the rulings of courts.

Simes and Smith, The Law of Future Interests, section 1228, states: "Occasionally one finds cases where vesting is, in effect, to take place 'in a reasonable time,' and the court sometimes presumes that a reasonable time will necessarily be within twenty-one years." Although the authors do not approve of this practice, their objection seems to deal primarily with interests in real property other than chattels real (leases) which they state (§ 331) : ". . . though arising out of

[2]For the rule of commercial frustration in the event that war causes a failure of the consideration or a practically total destruction of the expected value of the performance, see *20th Century Lites, Inc.* v. *Goodman,* 64 Cal.App.2d Supp. 938 [149 P.2d 88]; *Autry* v. *Republic Productions, Inc.,* 30 Cal.2d 144, 148 [180 P.2d 888]; *Lloyd* v. *Murphy,* 25 Cal.2d 48 [153 P.2d 47]; *McCulloch* v. *Liguori,* 88 Cal.App.2d 366 [199 P.2d 25]; *Brown* v. *Oshiro, supra,* 68 Cal.App.2d 393, 397.

land, are treated for most purposes as personalty, and therefore are not subject to most doctrines peculiarly applicable to freehold interests in land.'' [While it is true that the rule against remote vesting is hoary with age and is an excellent rule, and that in some situations in the past it has been applied rather fantastically (witness the rule of possibility of issue above discussed), those facts do not require a construction of the lease in question which would be completely out of step with modern possibilities. Applicable here is the following from the Restatement, Property, section 375: ''When a limitation is ambiguous and, under the rule against perpetuities, is legally more effective under one of the two or more possible constructions than it would be under any of the other possible constructions, then the legally more effective construction is adopted.'' I am not seeking to change the rule against remote vesting. I am merely construing the provision in the lease which deals with the commencement of the term as meaning the term must commence or the lease fail within a reasonable time which under no circumstances could mean 21 years.

I have been unable to find any case (and have been cited to none) in which a provision in a lease to the effect that the term is to commence within ''a reasonable time,'' nor any grant of a future interest to vest within ''a reasonable time,'' has ever been held violative of the rule against remote vesting nor the rule against perpetuities. To so hold is legalistic formalism completely out of step with modern concepts and conditions.

I would affirm the judgment.