[L. A. No. 25674.   In Bank.   Dec. 9, 1959.]

VENTURA PORT DISTRICT et al., Respondents, v. THE
TAXPAYERS, PROPERTY OWNERS, CITIZENS
AND ELECTORS OF THE VENTURA PORT DIS-
TRICT et al., Defendants; FLORENCE L. GREGORY,
Appellant.

Kenneth G. Haymaker for Appellant.

Ned S. Porter for Respondents.

McCOMB, J.—Defendant Florence L. Gregory appeals from a judgment of the Superior Court of Ventura County finding that (1) the proceedings of Ventura Port District (hereinafter referred to as "the district") in connection with the proposed issuance of Revenue Bonds, Series 1959, of the district, in the aggregate of $10,000,000, are valid under the Port District Act of the Harbors and Navigation Code and under the Reve-

nue Bond Law of 1941 of the Government Code and (2) Ordinance Number 1 of the district and the provisions and covenants therein contained are valid and binding, and bonds issued and sold pursuant to the provisions thereof will be valid, binding, and legally effective obligations of the district in accordance with their terms.

The district contemplates the acquisition and construction of a marina or small-craft recreational harbor with the proceeds of the bonds.

These questions are presented:

■ First. *Is the district validly organized under the Port District Act (Harb. & Nav. Code, §§ 6200-6372)?*

*Yes.* Under section 6233 of the Harbors and Navigation Code the establishment and legal existence of such a district and all proceedings in respect thereto are valid in every respect and incontestable unless proceedings denying the validity of its establishment are commenced within 60 days after the date of filing in the office of the secretary of state of the certificate of the board of supervisors canvassing and certifying the results of the election upon the proposed district organization.

The original certificate relating to the district was filed April 29, 1952, and an amended certificate was filed May 7, 1952.

No attempt was made to question the validity of the district's establishment within the time provided by law. Therefore, its establishment and legal existence are valid and incontestable.

■ Second. *Can the district validly finance the acquisition and construction of a recreational harbor under the Port District Act?*

*Yes.* Defendant contends that the enterprise for which the bonds are proposed to be issued contemplates, and is limited to, a marina or small-craft recreational harbor.

This contention is not tenable. The district's master plan and the economic study made by the district do include in their respective titles the terms "Small Craft Harbor" and "Small Craft Marina." However, no limitation is imposed upon access to, and use of, the facilities contemplated other than such limitations as may be inherent in the plans and specifications themselves. Use by smaller vessels engaged in commercial, as well as recreational, pursuits is contemplated. This intent is evidenced throughout the master plan. For example, in discussing the need for such a harbor for refuge, it is pointed

out that during the past 30 years there has been a succession of wrecks and rescues in the region involved, and that these wrecks have included not only pleasure boats but also commercial fishing vessels, a commercial oil tender, an oil-survey craft, yawls, and cargo vessels. It is also pointed out, "In fact, four streets in Ventura are named after lost vessels: Columbo, Kalorama, Ann, and Crimea." In addition, the following are excerpts from the master plan:

(1) "The object of the provisions of Chapter 1850 [referring to Chapter 1850 of the Statutes of 1955, expressing the desire of the Legislature for a statewide plan for small-craft harbors] is the gradual creation of a coordinated system of small craft harbors and waterways for the State that will provide adequate safety and facilities for the smaller vessels engaged in *commercial* and recreational pursuits." (Italics added.)

(2) "The typical large pier planned for the harbor is a timber structure 300 feet long and 30 feet wide providing berths for eight vessels of the size used for commercial fishing or sports fishing. At first only one such pier is planned but space has been allowed for three additional piers when the demand warrants their construction. . . . Visiting vessels of the Coast Guard and Navy and other large vessels can be accommodated at the large pier."

(3) "[I]n the spirit of serving a need, consideration has been given to the desirability of providing facilities for the unloading, icing, and shipment of fish from commercial craft for processing in Los Angeles. . . ."

(4) "The use of Hueneme for private vessels or offshore oil use is only on the basis that it will be permitted if the Navy does not need the space. There is never any guarantee of availability. Here again the Pierpont Bay harbor would meet a big need."

From the foregoing examples and from evidence received at the trial, it is clear that while the basic character of the proposed development is recreational, consideration has been given to providing needed facilities as a harbor for refuge and for commercial purposes to the extent that such needs are now apparent, as well as to providing flexibility for expansion along such lines as future community needs, in correlation with statewide plans for shoreline development and improvement, may dictate.

If the district were already operating a commercial port

and as part of its over-all development plan contemplated the providing of facilities for mooring small craft, no question would be raised. However, in the future the district may be operating a complete commercial and industrial port, of which the present contemplated marina could be but a minor part. There is no prohibition against the construction of a marina as part of an over-all commercial port, and there is nothing in the statute that provides what port facilities or portions thereof must be acquired first. It follows that the fact that it is planned to construct a marina first does not deprive the district of its authority to construct it.

In this connection it is to be noted that section 6340 of the Harbors and Navigation Code authorizes a district to create a revenue bonded indebtedness for the acquisition and construction of *any* improvements or facilities contained within its powers. As no limitation is imposed upon the scope of the Ventura Port by any present plans or intention of the board of port commissioners, the contemplated marina appears as the initial phase in the acquisition and construction of a possible projected commercial port. Operation of the small-craft portion of the over-all port will produce revenue for the district for use in the acquisition and construction of full-scale commercial facilities should the need therefor be demonstrated. Thus, the right to issue revenue bonds for *any* improvement within the powers of the district makes clear the propriety of the issuance of the proposed bonds.

Under section 6301 the district "may do any work or make any improvement . . . which will aid in the development or the improvement of navigation *or* commerce to or within the district." (Italics added.)

In *Haggerty* v. *City of Oakland*, 161 Cal.App.2d 407 [326 P.2d 957], as part of the port development the Port Commission of the City of Oakland arranged for the construction of a convention and banquet building. The court approved the trial court's finding that such facility was a facility and aid "incidental to the development, promotion and operation of the port, harbor . . . and to the furtherance of commerce, transportation, shipping and navigation. . . ." (P. 413.)

It is evident that a convention hall is further removed from a facility for a commercial port than are the marina facilities herein contemplated. If a convention hall aids commerce and navigation, clearly so does a marina or small-craft harbor.

The Supreme Court of Rhode Island, in *Opinion to the*

*Governor,* 76 R.I. 365 [70 A.2d 817, 819-820], expressed the view that a small-craft harbor is an aid to commerce. The opinion, given in response to an inquiry from the Governor under a certain Development Authority Act, advised that the establishment and operation of a marina and an auditorium constituted public purposes within the intent of the act, which stated that the exercise of powers therein granted would be in all respects ". . . for the increase of its *commerce* and prosperity and for the improvement of its health and living conditions. . . ." (Italics added.)

In *State* v. *City of Clearwater,* 135 Fla. 148 [184 So. 790, 794], the Supreme Court of Florida construed a statute authorizing a municipality to construct, maintain, and operate wharves, ship channels, breakwaters, and other facilities and issue bonds to carry out such powers or purposes, as authorizing such city to construct, operate, and maintain a yacht basin and issue bonds for such purposes. This decision was followed by the same court in *Miller* v. *City of St. Augustine,* 97 So.2d 256. In that case the court affirmed a decree validating revenue bonds for purposes including the construction or reconstruction of a municipal yacht pier under general language of the city charter similar to that contained in section 6295 of the Harbors and Navigation Code applicable to the district.

The Recreational Harbor District Act (Harb. & Nav. Code, §§ 6400-6694), referred to by defendant, sets forth a procedure by which lands, waters, and harbor areas may be impressed with a recreational character and segregated from the incidents of commercial navigation and commercial fisheries. As no general exclusion of commerce and commercial navigation is contemplated by the district, its organization under that act would have been inappropriate.

■ There is another reason for validating the proposed bond issue and proceedings related thereto. By the terms of the First and Second Validating Acts of 1959 (Stats. 1959, chap. 1447, p. 3723, and *ibid.,* chap. 1448, p. 3728) the organization and boundaries of the Ventura Port District were confirmed, validated, and declared legally effective. Those acts further confirmed, validated, and declared legally effective all acts and proceedings taken by or on behalf of any public body, as therein defined, under any law, or under color of any law, for the authorization, issuance, sale, or exchange of bonds of any such public body for any public purpose prior to July

6, 1959. The term "bonds" is defined in the acts as "all instruments evidencing an indebtedness of a public body incurred or to be incurred for any public purpose, and all instruments evidencing the borrowing of money in anticipation of taxes, revenues or other income of such body, and all instruments payable from revenues or special funds of such public bodies, and all instruments funding or refunding any thereof or any indebtedness."

On April 26, 1959, the district entered into an agreement with the State of California, acting by and through the Division of Small Craft Harbors, Department of Natural Resources, for a loan in the amount of $900,000 to enable the district to purchase real property necessary for a harbor and marina site and for engineering and construction of the Ventura Marina. The definition of "bonds," as set forth in the cited validating acts, encompasses the obligation of the district to repay the state loan from its revenues. Therefore, the state loan was validated by the acts.

As the state loan was incurred for payment of part of the cost of the marina project, the acts, in validating the loan, must necessarily be regarded as having validated the purpose for which the loan was made. It follows that such purpose, being valid as the basis for the state loan, is valid as the basis for the bonds here proposed to be issued.

The rule is that the Legislature may supply through a validating act any authority which it could have supplied prospectively through an enabling act. (*Cf. City of Fairfield* v. *Hutcheon,* 33 Cal.2d 475, 478 [4] [202 P.2d 745].)

Third. *May the district validly reserve the right to enter into a lease or leases of the contemplated enterprise?*

*Yes.* Defendant contends that under the provisions of section 18 of Ordinance Number 1 the district may lease all or substantially all the enterprise to be acquired to private individuals or private corporations under such terms as would remove from the jurisdiction of the board of port commissioners all real authority and control over the operation thereof. She then contends that such a lease would in effect place private property which had been taken purportedly for public purposes in the hands of private persons for purposes of private gain.

This contention is invalid. In the first place, the so-called master lease is not an integral part of the financing proposed by the district. The ordinance merely provides that "it being

recognized that under certain circumstances it may become desirable for the Board to lease all or substantially all of the Enterprise to others for operation, the District reserves the right to enter into any such lease or leases. . . .'' Such a lease may never become desirable.

There is, however, no legal inhibition against leases by the district, and the district may reserve the right to enter into leases should circumstances so dictate. Section 54516.1 of the Government Code, here applicable, expressly authorizes the district to enter into a contract for the operation and management of the enterprise, subject to certain restrictions, including restrictions against transferring its duties concerning the fixing of charges for the services or facilities furnished and the accounting for the revenues.

Section 6294 of the Harbors and Navigation Code provides, among other things, that the district may acquire and hold and enjoy, and *lease* or dispose of, real and personal property of every kind, within or without the district, necessary to the full or convenient exercise of its powers. Under the latter provision the lease is expressly authorized upon the mere finding that it is necessary to the *convenient* exercise of the district's powers.

While in the present case no lease is before the court, the conditions under which such a lease may be entered into are set forth in section 18 of the ordinance. Paragraph 3 thereof states: "It must be provided in such lease that the lease will remain in full force and effect only so long as all rentals due thereunder are paid promptly when due and the lessee is *operating,* maintaining and repairing the leased property to the full extent of the operating efficiency in which the Enterprise is required to be operated, maintained and repaired under the provisions of this ordinance." (Italics added.) By subparagraph (e) following numbered paragraph 8 of section 18 of the ordinance, the requirement of paragraph A of section 12 of the ordinance for maintenance and operation of the enterprise by the district is made applicable for purposes of enforcing the lease. Said paragraph A of section 12 reads as follows: "Subject to the provisions of this ordinance: (1) The District will maintain the Enterprise in good repair and working order and will operate it efficiently and will faithfully and punctually perform all duties with reference to the Enterprise required by the Constitution and Laws of the State of California and this ordinance; (2) The District will establish

and enforce reasonable rules and regulations governing the use of the Enterprise and the operation thereof. All compensation, salaries, fees and wages paid by it in connection with the maintenance, repair and operation of the Enterprise shall be reasonable and no more persons will be employed by it than are necessary; (3) The District will at all times maintain the same in good repair and in sound operating condition and will make all necessary repairs, renewals and replacements, and will comply with all valid acts, rules, regulations, orders and directions of any legislative, executive, administrative or judicial body applicable to the Enterprise.''

In *City & County of San Francisco* v. *Ross*, 44 Cal.2d 52 [279 P.2d 529], holding a proposed lease of garage facilities void for lack of controls by the municipality, it was said at page 57: ''. . . in this state . . . the courts have attached significance to the control retained by governing bodies as indicative that public lands leased to private individuals were still serving a public purpose. In *City of Oakland* v. *Williams*, 206 Cal. 315 [274 P. 328], it appeared that tidelands were granted by the state to the city of Oakland for public purposes. In upholding a lease of some of that land to a private operator to conduct a warehouse thereon, the court set forth at length the terms of the lease which would insure performance by the lessee of the uses and purposes specified for which the city had been granted the lands. In *Redevelopment Agency* v. *Hayes*, 122 Cal.App.2d 777 [266 P.2d 105], the court held that the taking of land by eminent domain for public use was proper and that the intention that the land would be returned to private ownership but 'subject to restrictions protecting the public use' did not make it any the less a public use.''

It is clear that the controls retained by the district will assure that the enterprise will continue to serve the same public purposes for which it is proposed to be acquired and constructed.

The judgment is affirmed. Let the remittitur issue forthwith.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., Peters, J., and White, J. concurred.